UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

TERESA BARRY,

              Plaintiff,

    v.

JAMES P. O'GRADY, et al.,

            Defendants.

Case No. 2:14-cv-2693
CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Terence P. Kemp

<u>OPINION AND ORDER</u>

This matter is before the Court on several motions: Defendants' Motion for Summary Judgment [ECF No. 75]; Plaintiff's Objections and Motion to Strike [ECF No. 113]; and Plaintiff's Motion for Leave to File a Third Amended Complaint [ECF No. 103]. For the following reasons, the Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**, Plaintiff's Objections and Motion to Strike is **DENIED AS MOOT**, and Plaintiff's Motion for Leave is **GRANTED**.

## I.    BACKGROUND

**A.**    **Factual Background**

    **1.**    **Barry's Start at the FCMC**

At this stage, in which Defendants seek judgment in lieu of a trial, the Court is required to view the facts of the case in the light most favorable to Barry—the nonmoving party with respect to Defendants' Motion for Summary Judgment. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970). So long as the record indicates a genuine issue of material fact, summary judgment must be denied.

Plaintiff Teresa Barry began working at the Franklin County Municipal Court ("FCMC")

in 2005. (Barry Dep. Part 1 at PageID 2721 [ECF No. 97-1].) She was hired as a judicial secretary for Judges Harland Hale and Amy Salerno. (*See* Barry Decl. ¶ 11 [ECF No. 104].) Barry worked for Judges Hale and Salerno for nearly two years. (*See* Barry Dep. Part 1 at PageID 2734–35.)

In February 2007, Barry was transferred to Judge Andrea Peeples's chambers on the 14th Floor of the FCMC. (Barry Dep. Part 1 at PageID 2734–35.)[1] Like the other municipal court judges, Judge Peeples occupied shared chambers. (*See id.* at PageID 2735.) Barry served as secretary to both judges in chambers: the fluctuating chambers mate and Judge Peeples. (*See id.*) Barry worked successfully, and without incident, as a judicial secretary for nearly five years. (*See id.* at PageID 2736–37.) During those years, Barry received only positive comments from judges and had no complaints filed in her performance record. (*See id.*) In Barry's first Employee Performance Evaluation, Judge Peeples indicated that Barry met the performance standards in eight categories and exceeded the performance standard in one category. (*Id.* at PageID 2738.)

### 2. Judge O'Grady Takes the Bench

Barry alleges that her work environment changed dramatically in December 2011 when Defendant Judge James O'Grady took the bench and joined the chambers shared by Judge Peeples. (*See* Barry Dep. Part 1 at PageID 2742.) According to Barry, Judge O'Grady would frequently joke and laugh with his bailiff, Amy Frank, and Judge Peeple's bailiff, Joye Saunders. (*See id.* at PageID 2745.) Judge O'Grady and the bailiffs would congregate near Barry's desk. (*See id.*) She alleges that the conversations frequently involved language that Barry considered "foul" and "demeaning to women," including regular reference to anal sex. (*Id.* at PageID 2743; Barry Decl. ¶ 3 [ECF No. 104].) According to Barry, Judge O'Grady, for example, used the word

---

[1] Barry was transferred from Judge Hale's chambers in circumstances that purportedly shed light on later actions taken by Defendants. (*See* Resp. to Mot. for Summ. J. at 13–16 [ECF No. 108].) Because the Court does not rely on those events in its present decision, the Court need not recount them here.

"fuck" on a "regular, daily basis." (Barry Dep. Part 1 at PageID 2744.) He would, Barry reports, "maybe walk off the bench and say, that guy was a fucking idiot, or she's a fucking idiot." (*Id.* at PageID 2744–45.) And he would, at times, use the word "bitch" when referring to women. (*Id.* at PageID 2746.) Judge O'Grady once commented that an attorney was "smoking hot"; he then mused: "if I wasn't married." (*Id.* at PageID 2744.) Judge O'Grady would also "reference attire, short skirts, things like that." (*Id.*) Although Barry regularly heard Judge O'Grady's comments, the comments were not directed at Barry. (*Id.* at PageID 2746.) According to Barry, Judge O'Grady was purportedly interested in whom Barry was dating: "He would ask if [she] had a date that weekend, where [they] went, did [they] have drinks, and [was she] going to see him again." (*Id.*)

Barry points to Judge O'Grady's actions toward Tracy Barnes, an employee in the assignment office, as an example of Judge O'Grady's demeaning conduct toward women. (*See* Barry Dep. Part 1 at PageID 2747.) Barnes submitted a writing sample as part of an application for a promotion. (*Id.*) Judge O'Grady opposed Barnes's promotion. (*Id.*) After reviewing her writing sample, he commented to his bailiff: "Look at this. . . . Look, she can't even form a fucking sentence." (*Id.*) After Barnes failed to get the promotion, Judge O'Grady laughed and said, "Do you think Tracy hates me now?" (*Id.*)

Barry also identifies several instances where Saunders read excerpts aloud from *Fifty Shades of Grey* in chambers during work hours. (Barry Dep. Part 2 at PageID 3101–02 [ECF No. 102].) Saunders would read excerpts of the sex acts in the book to Frank and Judge O'Grady; the three of them would then share a laugh. (*Id.* at PageID 3102.)

### 3.    Description of a Female Attorney

According to Barry, the incident that most disturbed her was a sexually explicit

3

conversation between Judge O'Grady and the bailiffs on November 14, 2012. (*See* Barry Dep. Part 1 at PageID 2776.) The conversation revolved around the alleged sexual exploits of a female attorney practicing before the municipal court. (*Id.*) According to Barry, bailiff Frank did most of the talking. She described to Saunders and Judge O'Grady how the female attorney was seeing a male attorney. (*Id.*) The male attorney purportedly got "his whole down-below waxed, his balls, everything," and the female attorney, as relayed by Frank, would "lick[] him like a lap dog." (*Id.* at PageID 2776–77.) Frank then related that the same female attorney supposedly had sex with the male attorney and also with a second male attorney on the same day. (*Id.* at PageID 2777.) At some point in the conversation, Saunders brought up anal sex. (*Id.* at PageID 2778.) Saunders joked that it "was an exit only, and nothing entered in." (*Id.*) Judge O'Grady also contributed to the gossip. (*Id.*) He remarked about the female attorney "being good at what she does." (*Id.*) After laughing about the attorney's sex life, Judge O'Grady and the bailiffs joked about the same attorney's conviction on three impaired driving charges. (*Id.* at PageID 2779.)

After listening to Judge O'Grady and the bailiffs, Barry decided to act. She sent a private Facebook message to the female attorney that same evening. (Barry Dep. Part 1 at PageID 2782.) In the message, Barry informed the attorney that she might want to be more careful with what she talks about with respect to her personal life. (*Id.* at PageID 2783.) The attorney responded with concern; she indicated that she would come in to see Barry the next day. (*Id.* at PageID 2783–84.)

That same evening, Barry also made a posting on Facebook to her friends. (Barry Dep. Part 1 at PageID 2786–88.) She posted:

> I spent this afternoon getting sick from my co workers talking horrible about there friends and mine. It all came down to being jealous. The men and women are hot and the people especially women are je[a]lous pigs. Can u imagine thinking someone was ur friend and that bitch u thought was xlur friend ran her mouth. U

4

> know what. Get in shape and stop eating and drinking and u could have her life.
> As far as the others chiming in ur just miserable. So she has a great sex life. So do
> I . . . women are judged by beauty more from jealous women than anyone. Oh one
> last thing the one wom[a]n that chimes in alot prayed and bowed her head to pray.
> I guarantee u she is not in his plan.

(Barry Facebook Post at PageID 657 [ECF No. 75-11].) At her deposition, Barry decoded this

post. The "hot" men and women she referenced were the attorneys referenced above. (Barry

Dep. Part 1 at PageID 2789.) The "miserable" people chiming in were Frank, Saunders, and

Judge O'Grady. (*Id.* at 2790.) And the woman who bowed her head to pray was Saunders. (*Id.* at

PageID 2792.)

The next day, November 15, 2012, the female attorney came to chambers and spoke with

Barry. (Barry Dep. Part 1 at PageID 2797.) The conversation was brief. Barry informed the

attorney that Frank, Saunders, and Judge O'Grady had talked about her sex life and her OVIs.

(*Id.* at PageID 2800–01.) Barry then advised her: "be careful what you tell people because, you

know, it gets around and it can be embarrassing and people talking about you." (*Id.* at PageID

2798.) After the conversation with Barry, the female attorney walked into Judge O'Grady's

office and shut the door. (*Id.* at PageID 2798–99.) The attorney was in Judge O'Grady's office

for 10 to 15 minutes. (*Id.* at PageID 2799.) The attorney left and then Judge O'Grady eventually

walked out of his office to take the bench. (*Id.*) His face "was beet red" and, according to Barry,

he looked at her "like he probably wanted to kill [her]." (*Id.*) At one point that day, he stated that

he wished he could fire somebody. (*See* Barry Dep. Part 2 at PageID 3063 [ECF No. 102].)

In the grievance she submitted to the Office of Disciplinary Counsel ("ODC"), and in her

deposition, Barry expressed disbelief that the attorney would speak to Judge O'Grady. (Barry

Dep. Part 1 at PageID 2799–801; ODC Compl. at PageID 596 [ECF No. 75-7].)[2] As Barry

---

[2] In their Reply, Defendants assert that Barry's ODC grievance [ECF No. 75-5] and Barry's timeline of
events [ECF No. 107-4] are out-of-court statements, inadmissible for the truth of the matter asserted.

explained: "I was trying to give her a heads-up that people were talking about her, and she decided on her own to go talk to Judge O'Grady. . . . [I]f that was me, I wouldn't have done that." (Barry Dep. Part 1 at PageID 2800.)

Following the incident, Judge O'Grady was angry and hostile toward Barry. (Barry Dep. Part 2 at PageID 3063.) Barry was on medical leave from November 28, 2012, through January 4, 2013. (*See* FCMC Time Clock at PageID 2687 [ECF No. 96-3].) According to Barry, Judge O'Grady's hostility continued after Barry returned from leave. He told Barry, for example, that she needed to take her daughter's picture off her computer's screen-saver. (Barry Dep. Part 2 at PageID 3063.)

### 4.     The April 18 Employee Performance Evaluation

Barry received an Employee Performance Evaluation on April 18, 2013. Present at the evaluation meeting were Barry, Abbie Armitage (the FCMC Human Resources Manager), and Judges O'Grady and Peeples. (*See* Armitage Dep. at PageID 786 [ECF No. 76-1].) Judge O'Grady wrote the evaluation and did most of the speaking at the meeting. (*See* Barry Dep. Part 1 at PageID 2741–42; O'Grady Dep. at PageID 1409–17 [ECF No. 79-1].) As Barry recalls the meeting, Judge O'Grady was hostile and angry toward her. (Barry Dep. Part 1 at PageID 2816.) The evaluation contained nine performance competencies (i.e., areas of performance); in three of those categories, Judge O'Grady gave Barry a "Needs Improvement" rating. (Apr. 18, 2013 Evaluation at PageID 2600–04 [ECF No. 91-1]; *see* O'Grady Dep. at PageID 1409–17.) One of Barry's "Needs Improvement" ratings was actually determined during the meeting. For the "Adaptability/Flexibility" category, Judge O'Grady initially gave Barry a rating of "Meets

---

(Reply in Supp. of Mot. for Summ. J. at 3 n.2 [ECF No. 112].) To the extent that Defendants are attempting to assert an objection under Federal Rule 56(c)(2), that objection is not well taken. Defendants have failed to show that the material contained in the challenged documents "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

Standards." (O'Grady Dep. at PageID 1415–16.) During the course of the meeting, however, Judge O'Grady downgraded her rating to "Needs Improvement." (*See id.*) He added written comments under the category as well. He wrote: "[m]ore accountability for own work problems" and "[a]ccept criticism better." (*Id.* at PageID 1416–17.)

Barry prepared a written response to her evaluation after the April 18 meeting. In her response, Barry challenged her "Needs Improvement" ratings. (Resp. to Evaluation at PageID 2605–06 [ECF No. 91-2].) She also challenged some of the ratings that were listed as "Meets Standards" but, according to Barry, should have been listed as "Exceed[s] Standards." (*Id.*) Barry also mentioned in the response that Judge O'Grady "never produces work and is constantly sitting in the chair by my desk laughing and joking and making rude comments about people and using foul language." (*Id.* at PageID 2606.) She noted that Judge O'Grady only starting picking on her performance after the incident involving the female attorney—which Barry did not describe in the response. (*Id.* at PageID 2605–06.) She provided the response to Armitage sometime after May 7. (*See* Armitage Dep. at PageID 833–37 [ECF No. 76-1]; Armitage Errata Sheet at PageID 979–80 [ECF No. 76-3].)

### 5. The May 7 Telephone Conversation with Shaw

Barry called Defendant Emily Shaw, the FCMC Administrator, on May 7, 2013, to report the events in chambers that purportedly explain why she received "Needs Improvement" ratings on her April 18 performance evaluation. (*See* Barry Dep. Part 1 at PageID 2821–28 [ECF No. 97-1]; Shaw Notes at PageID 2626 [ECF No. 91-9].) Barry complained that Judge O'Grady was retaliating against her through the performance evaluation. (*See* Shaw Dep. at PageID 1744–45, 1768–69 [ECF No. 81-1].) Barry explained the circumstances surrounding the incident with the attorney and then described the other conduct (discussed above) of Frank, Saunders, and Judge

O'Grady that contributed to the sexual harassment she allegedly suffered and the purported hostile work environment in chambers. (*See* Barry Dep. Part 1 at PageID 2821–28; Shaw Dep. at PageID 1785; Shaw Notes at PageID 2626–28.) Barry indicated that she enjoyed working with Judge Peeples and, therefore, did not want to switch chambers. (*See* Barry Dep. Part 1 at PageID 2821–28; Shaw Notes at PageID 2628.) Barry concluded by requesting that the court mediate the situation. (*See* Barry Dep. Part 1 at PageID 2821–28; Shaw Notes at PageID 2628.)

Shaw typed up her notes to memorialize her conversation with Barry. (*See* Shaw Notes at PageID 2626.) She then communicated Barry's accusations to Armitage and Defendant Judges James Green and Carrie Glaeden. (*See* Shaw Dep. at PageID 1766, 1773–80, 1800–01.) Judge Green was the Administrative Judge at the time. (*See* Green Dep. at PageID 1210 [ECF No. 78-1].) And Judge Glaeden was the Chair of the FCMC's Personnel Committee. (*See* Glaeden Dep. at PageID 1057–58 [ECF No. 77-1].) Shaw corresponded with Armitage and the judges from May 7 through May 10, 2013. (*See id.*) Through her correspondence, Shaw drafted and, on May 10, sent a letter to Barry:

> The Court takes very seriously the allegations you made during your May 7, 2013 phone conversation with Court Administrator, Emily Shaw. Based on the nature of your complaint, the Court will immediately follow the reporting procedures outlined in Court Policy 03.01 regarding Equal Opportunity and Sexual Harassment (copy attached). Until those matters have been resolved, the Court will take measures to limit all interaction between you and Judge O'Grady. That would be accomplished by relocating you to another Judges' or Magistrates' chambers while this investigation is pending. In doing so, you will not perform secretarial services or any other work for or in the chambers or courtroom of Judge O'Grady under any circumstances. Further, both you and Judge O'Grady should make efforts to avoid contact.
>
> This Court is making every effort to ensure that this matter is addressed in an impartial, complete, and accurate manner. Therefore, please refrain from discussing this matter with employees or others who work in the Courthouse. If any judge or employee attempts to discuss this matter with you, please report that in writing to me immediately.

8

(May 10, 2013 Shaw Ltr. to Barry at PageID 2607 [ECF No. 91-3].) Barry was placed on administrative leave until she could be placed in the chambers of another judge or magistrate. (*See* Shaw Dep. at PageID 1801, 1809–10 [ECF No. 81-1].)

Barry's administrative leave corresponded, to some extent, with her medical leave. Beginning in May 2013, and continuing through 2014, Barry began taking leave intermittently to address what her physician described as depression due to work-related stress. (*See* Armitage Dep. at PageID 963–65 [ECF No. 76-1].)

Not long after Shaw and Barry's telephone conversation, Shaw and Judges Green and Glaeden informed Judge O'Grady that Barry had filed a complaint against him. (O'Grady Dep. at PageID 1420–22 [ECF No. 79-1].) Judge O'Grady later reviewed Shaw's letter to Barry; from reading the letter and meeting with Shaw and Judges Green and Glaeden, Judge O'Grady understood that he was not to have any contact with Barry during the pendency of the investigation. (*Id.* at PageID 1422–26.)

In the spring of 2013, Armitage began preparing a timeline of events relating to Barry's accusations against Judge O'Grady and work performance. (*See* Armitage Dep. at PageID 774–76, 841.) In the timeline, Armitage also took note of Barry's attendance. (*Id.* at PageID 842–43.) Armitage observed, for example, that Barry called off work on May 7, 2013. (*Id.* at PageID 842.) And on May 9, 2013, Armitage noted that Barry left work early without permission. (*Id.* at PageID 842–43.)

Shaw was watching Barry's work attendance too. (*See* May 23, 2013 Shaw Email to Armitage at PageID 2704 [ECF No. 96-11].) In June 2013, for example, Shaw emailed Armitage with the subject line "Teresa Barry Reporting Requirements 6.11.13"; Shaw advised Armitage that "the judges want her written up but I think we're at a verbal since there is nothing in file and

I'm also not sure that a work improvement plan exists or has been presented to her yet." (June 12, 2013 Shaw Email to Armitage at PageID 2705 [ECF No. 96-12].)

### 6.    The July 2 Meeting and the WIP

On July 2, 2013, upon her return from a period of leave, Barry met with Armitage and Judge Glaeden. (Armitage Dep. at PageID 830–31, 865 [ECF No. 76-1].) Armitage and Judge Glaeden had prepared a Work Improvement Plan ("WIP") for Barry, which they gave to her during the July 2 meeting. (*Id.*) A WIP is mandated whenever an employee's performance evaluation contains a "Needs Improvement" rating—a fact that Judge O'Grady likely knew when he completed Barry's performance evaluation. (*See* Armitage Dep. at PageID 809, 823–26.) An employee's failure to meet the requirements of a WIP could result in termination. (July 2, 2013 WIP at PageID 2613 [ECF No. 91-4].)

Armitage and Judge Glaeden placed Barry on a WIP despite their knowledge that Barry was accusing Judge O'Grady of giving her a "Needs Improvement" rating in retaliation for her speaking with the female attorney. (*See* Armitage Dep. at PageID 835, 865–66; Glaeden Dep. at PageID 1057–58 [ECF No. 77-1].) Barry's retaliation accusation had not been investigated by the FCMC administration (i.e., Shaw and Armitage) when Barry received her WIP. (*See* Armitage Dep. at PageID 866–67.) Rather, without an investigation into Barry's accusation, the FCMC administration accepted the accuracy of the performance ratings Barry received from Judge O'Grady. (*See* Armitage Dep. at PageID 866–68; Glaeden Dep. at PageID 1098.)

The FCMC administration did not conduct an investigation into Barry's accusation that Judge O'Grady retaliated against her. (*See* Armitage Dep. at PageID 866–67; Shaw Dep. at PageID 1778–80, 1805–06, 1809–14 [ECF No. 81-1].) Nor did the FCMC administration

conduct its own investigation into Barry's sexual harassment allegations against Frank, Saunders, and Judge O'Grady. (*See* Shaw Dep. at PageID 1771–72, 1805–06, 1809–18.)

As Shaw stated in her May 10, 2013 letter, because Barry's accusations against Judge O'Grady fell within the court's sexual harassment policy, Administrative Judge Green was obligated to report the accusations to the Office of Disciplinary Counsel. (*See* May 10, 2013 Shaw Ltr. to Barry at PageID 2607 [ECF No. 91-3]; FCMC Employee Handbook at PageID 2611 [ECF No. 91-3].) As Judge Glaeden acknowledged, the ODC reporting requirement does not preclude the FCMC from conducting its own inquiries into a judge's behavior. (Glaeden Dep. at PageID 1035 [ECF No. 77-1].) No investigation occurred, moreover, despite the court's obligation, under its sexual harassment policy (Policy Number 3.01), to promptly investigate harassment charges lodged against FCMC staff—including court bailiffs like Frank and Saunders. (FCMC Employee Handbook at PageID 2610–11.)

During the July 2 meeting, Armitage and Judge Glaeden asked Barry if she had checked on the status of the complaint (i.e., grievance) that Judge Green was supposed to have filed with the ODC. (Barry Dep. Part 1 at PageID 2849 [ECF No. 97-1]; Glaeden Dep. at PageID 1102 [ECF No. 77-1].) Barry later spoke with Judge Green; she asked if he had communicated her concerns about Judge O'Grady to the ODC. (Green Dep. at PageID 1276–77 [ECF No. 78-1].)

Judge Green had, in fact, called the ODC within 24 hours of learning about Barry's concerns regarding Judge O'Grady. (Green Dep. at PageID 1278.) He relayed those concerns to Joseph Caligiuri. (*Id.* at PageID 1276.) Following up on the ODC grievance after speaking with Barry in early July, Judge Green learned from Caligiuri that the ODC had "dropped the ball" on processing the grievance against Judge O'Grady but that the ODC would now follow up on it.

(*Id.* at PageID 1277.) Judge Green explained this mix-up to Barry and provided her with information on how to contact the ODC. (*Id.*)

After her conversation with Judge Green, Barry drafted a grievance and then, and July 3, delivered it to the ODC. (Barry Dep. Part 1 at PageID 61–62; ODC Compl. at PageID 595 [ECF No. 75-7].) In her grievance, Barry discussed Judge O'Grady's foul language, the incident with the attorney, the April 18, 2013 Employee Performance Evaluation, and her relocation to the magistrate chambers described below. (ODC Compl. at PageID 595–99.)

### 7. The Transfer to the Magistrate Chambers

Also, during the July 2 meeting, Judge Glaeden informed Barry that she would be temporarily assigned to work on the 11th Floor of the FCMC as a secretary to Magistrates Tony Paat and David Jump. (Glaeden Dep. at PageID 1117–18.) Shaw made this reassignment determination. (*See* Armitage Dep. at PageID 863–64; Glaeden Dep. at PageID 1117–18; Shaw Dep. at PageID 1890.) She arranged for a secretary swap: Barry would move to the Magistrates' chambers and the Magistrates' secretary would move to the 14th Floor to work with Judges O'Grady and Peeples. (*See* Shaw Dep. at PageID 1890.) Under Barry's WIP, Magistrates Paat and Jump were tasked with monitoring Barry's performance progress and issuing a 90 day evaluation. (July 2, 2013 WIP at PageID 2613 [ECF No. 91-4].)

Barry initially resisted moving to the 11th Floor to work with the Magistrates. (June 28, 2013 Shaw Email to Armitage at PageID 3173 [ECF No. 107-3].) She wanted to work in a judge's chambers. (*Id.*) Shaw informed her, however, that "there were no judges that wanted to make that switch and that we couldn't force it upon them." (*Id.*) Whether Shaw actually asked the body of FCMC judges if they were willing to switch secretaries is uncertain: Judges Green

12

testified during his deposition that he does not believe the question was presented to the judges. (Green Dep. at PageID 1273–74 [ECF No. 78-1].)

Barry "loved her assignment with the magistrates." (Resp. to Mot. for Summ. J. at 38 [ECF No. 108]; *see* Barry Dep. Part 1 at PageID 2857.) Barry disliked, however, having to occasionally "buzz" Judge O'Grady into the magistrate chambers. (*See* Barry Dep. Part 2 at PageID 3067–68 [ECF No. 102].) Part of Barry's job on the 11th Floor was to monitor a video screen that displayed a video feed of a locked entrance to chambers. (Barry Decl. at 2 [ECF No. 104].) When visitors pressed a buzzer at the entrance, Barry would push a button to unlock the door. (*See id.*) On several occasions, Judge O'Grady showed up at the entrance to the magistrates chambers and pushed the buzzer. (Barry Dep. Part 2 at PageID 3067–68.)  Barry would buzz him into chambers and Judge O'Grady would, while whistling, walk slowly by and glance at Barry through a glass wall. (*Id.* at PageID 3068–69.) Barry also had to occasionally buzz Saunders into the magistrate chambers. (Barry Decl. at 2.) Unlike Judge O'Grady, who simply walked by, Saunders would enter the area where Barry was seated and chat with one of the bailiffs. (*Id.*)

Barry asserts that Judge O'Grady could have avoided her, as he was obligated to do under the May 10 letter, by (a) using a separate, public entrance to chambers or by (b) using his swipe card, rather than the buzzer, to enter the door monitored by Barry. (Barry Decl. at 2.) And Barry further asserts that, prior to her arrival on the 11th Floor, Judge O'Grady did not visit the magistrate chambers. (Barry Dep. Part 2 at PageID 3070.)

Barry reached out to Shaw for help with Judge O'Grady's 11th Floor visits. (*See* Sept. 6, 2013 Barry Email to Shaw at PageID 2617 [ECF No. 91-6].) Shaw informed Judge Green about the visits. (*See* Shaw Dep. at PageID 1917 [ECF No. 81-1].) Shaw did not, however, ask him to speak with Judge O'Grady. (*Id.*) Shaw also spoke with Administrative Magistrate Graham about

Judge O'Grady's trips to the 11th Floor. (*Id.* at PageID 1921.) Shaw checked with Graham to see whether, to her knowledge, Judge O'Grady had been speaking with any magistrates about Barry's application to work as a magistrate's bailiff. (*Id.* at PageID 1921–22.) Shaw did not speak with Magistrates Paat and Jump about the visits. (*See id.* at PageID 1923.) Nor did Shaw speak with Judge O'Grady about the visits. (*See* O'Grady Dep. at PageID 1444 [ECF No. 79-1].)

Barry reached out to Holly Gleason, the Assistant FCMC Administrator, about Judge O'Grady's visits too. (Shaw Dep. at PageID 1919–20.) Gleason conveyed Barry's concerns to Shaw. (*Id.* at PageID 1920.) And Shaw, in turn, emailed Barry on September 24, 2013; she reassured Barry that the "Court Administration [was] taking many efforts to limit the interaction between [her and Judge O'Grady]." (Sept. 24, 2013 Shaw Email to Barry at PageID 2618 [ECF No. 91-7].) Shaw also indicated that it would be difficult to speculate about Judge O'Grady's and Saunders's motives for being on the 11th Floor. (*Id.*)

### 8. The Transfer to the SRO Position

On September 25, 2013, one day after Shaw and Barry corresponded about Judge O'Grady's appearances on the 11th Floor, Shaw and Armitage informed Barry that there was an opening as a Support Relief Officer ("SRO") in the FCMC's probation department. (Barry Dep. Part 1 at PageID 2866.) They told Barry that the position would be a great fresh start for her and an opportunity to distance herself from Judge O'Grady. (*Id.* at PageID 2867.) Shaw and Armitage were, in fact, trying to procure a new position for Barry. (*See id.* at PageID 2860–61; Shaw Dep. at PageID 1981–82.). They informed Barry that the Magistrates' secretary, Lori Banfield,[3] was returning to the 11th Floor; Barry could not return to being a judicial secretary

---

[3] In depositions and other filings, Lori Banfield is, at times, referred to as "Lori Weiscarver" or "Lori Weiscarver-Banfield."

though because, Shaw and Armitage explained, no judge was willing to trade or switch secretaries. (*See* Barry Dep. Part 1 at PageID 2860–61; Shaw Dep. at PageID 1981–82.)

Barry expressed interest in assuming the SRO position. (*See* Barry Dep. Part 1 at PageID 2867–68; Barry Timeline at PageID 3175 [ECF No. 107-4]; Shaw Dep. at PageID 1931, 1935, 1945.) Barry has since testified, though, to feeling like she had no choice in the matter given that Banfield was returning to her position with the Magistrates—the position that Barry was temporarily filling. (*See* Barry Dep. Part 1 at PageID 2860–61, 2879.) Shaw and Armitage informed Barry that she would begin her new position as an SRO in two weeks. (*See* Barry Timeline at PageID 3175.)

Two days later, on September 27, 2013, Armitage came to Barry's workstation on the 11th Floor and informed her that she was needed in the probation department immediately—not in two weeks. (*See* Barry Timeline at PageID 3176.) Armitage admitted that she had been confused about the timeframe of Barry's move to probation. (*Id.*)

After speaking with Armitage, Barry visited the probation department to speak with her soon-to-be supervisor, Beverly Sullivan. (Barry Dep. Part 1 at PageID 2875.) Concerned about the new position, Barry also met with Defendant Michael Roth, the Chief Probation Officer. (*Id.*) Roth reassured her that the probation department was "growing [by] leaps and bounds" and that she was needed there. (*Id.*) Still concerned, Barry met with Shaw. Shaw reiterated Roth's assertion that Barry was needed immediately in the SRO position. (*See id.* at PageID 2875–76.)

That same day—September 27—Barry's secretarial position with Judges Peeples and O'Grady was posted as open. (Job Posting at PageID 2619–21 [ECF No. 91-8].) Also around that same period of time, Magistrates Paat and Jump wrote their evaluation of Barry's performance. (Magistrate Evaluation at PageID 2678 [ECF No. 96-1].) They assigned her a "Meets

15

Standards/Fully Competent" rating in nine performance competencies, and they complimented her work, noting that "she completed her duties timely and in a professional manner." (*Id.* at PageID 2678–82.)

Barry's transfer to the SRO position in the probation department was approved through a Personnel Action Form. (*See* Personnel Action Form at PageID 2391 [ECF No. 83-10].) The form was signed by eight judges, including Judges Glaeden, Green, and O'Grady. (*Id.*)

### 9. Barry's Experience in the Probation Department

Barry began in the probation department on September 30, 2013. (*See* Barry Timeline at PageID 3176.) Although Barry was supposed to be assuming an SRO position, Sullivan was under the impression that Barry would be working as a receptionist. (*See* Sullivan Dep. at PageID 2167–68 [ECF No. 82-1].) The SRO position that Barry would be filling had been empty for nearly seven months—since the termination of the individual who formerly occupied the position, Susan Taylor. (*See* Sullivan Dep. at PageID 2175–76 [ECF No. 82-1].) And Roth had informed Sullivan after Taylor's termination that the SRO position would not be filled. (*Id.*) Only weeks later, after Barry asked Sullivan about her training, did Sullivan realize that Barry was supposed to be working as an SRO. (*See* Ceneskie Decl. at PageID 2647 [ECF No. 92-1]; Sullivan Dep. at PageID 2169, 2179.)

According to Sullivan, an SRO's duties include, among other things, completing mail runs, helping with intakes, purging old records, and filling in on the telephone switchboard and reception desk, when needed. (*See* Sullivan Dep. at PageID 2198.) Barry did not experience a reduction in pay when she moved to the probation department. (Barry Dep. Part 1 at PageID 2880.) The SRO position, however, has a lower pay classification than a judicial secretary position, meaning that Barry's opportunities for a pay increase were limited compared to those of

16

a judicial secretary. (Shaw Dep. at PageID 1725.) The SRO position, moreover, involved a different, and less pleasant, work environment than what Barry had grown accustomed to as a judicial and magistrate secretary. (*See* Barry Dep. Part 1 at PageID 2887–88.) From Barry's perspective, "the entire [probation] department was filthy": "There was one individual in there that had a problem with hygiene and she had soiled a couple chairs . . . . The bathroom was filthy. That's where they did the urine test. I was not used to that atmosphere." (*Id.*)

As of September 2013, there were four SROs, including Barry, in the probation department. "Almost from the start," Michelle Ceneskie, a fellow SRO, observed that "things were not normal with [Barry's] assignment":

> There were two receptionist positions, and both were filled. Yet, [Barry] did nothing for weeks and weeks but sit with the receptionists. . . . [T]here did not appear to be a need for any assistant to those officers . . . ;
>
> . . . .
>
> Not long after [Barry] was in reception, she began to question when she would be trained as a support relief officer ["SRO"]. Up to that point, we SRO[s] had thought she was a receptionist;
>
> It was about two months[] after she came to Probation that Shirley Thompson actually began training [Barry] on SRO duties. However, for many more weeks, [Barry] did nothing except purg[e] files to make them ready to be scanned into the 3SG system;
>
> Purging files became the responsibility of the Probation Officers. In a memo dated June 28, 2012, signed by Bev Sullivan, Mike Roth ordered that SRO[s] were no longer to purge files. While an SRO might help purge files at the end of the day after completing her duties, this was by no means anything like full time work. Yet, [Barry] did it day in and day out for weeks;
>
> As she was being trained, and this was in the spring of 2014, I noticed that [Barry] was regularly called into either Beverly Sullivan, or Shirley Thompson's, office. When she left the office, she was clearly upset. [Barry] would come to us SRO[s] and tell us that she was being told that she was making mistakes and doing work incorrectly. She would ask us if we were trained to do it that way, and many times what she related to us as the "correct" way to do a job was not what we had learned. Bev would then send out a memo telling the SRO[s] to stop doing

17

the task as we had always done it, but change to the way she had told [Barry] to do it;

In addition to these visits to the supervisors' offices, which eventually occurred on a daily basis, I noticed that supervisors were paying much more attention to [Barry's] activities than they were to any other SRO;

Finally, at a point sometime within a few weeks of [Barry's] last day, the other SRO[s] told me that they had been ordered by Beverly Sullivan to not answer any question put to them by [Barry] about our work. I told them that I had not been so ordered, so I would continue to give [Barry] advice if she had questions;

Not long after that, Beverly Sullivan called me into her office and ordered me also to decline to give Teresa any help by answering her questions. Sullivan gave me no reason for this order;

. . . .

[I]n my years in the [probation] department, no SRO, nor any other staffer, had been subjected to the kind of treatment I witnessed [Barry] endure; . . . .

(Ceneskie Decl. at PageID 2646–49 [ECF No. 92-1] (paragraph numbers omitted).)

Sullivan's interactions with Barry were colored by her mistaken belief that Barry had, in the fall of 2013, already filed a lawsuit against the FCMC. (*See* Sullivan Dep. at PageID 2078, 2182 [ECF No. 82-1].) Sullivan feared that she might be dragged into Barry's nonexistent lawsuit if she learned too much about Barry's background or experiences at the court. (*See id.* at PageID 2080–82, 2182.) Sullivan, for example, learned from Shaw and Armitage around the time that Barry started as an SRO that she would not receive Barry's personnel record. (*See id.* at PageID 2080–82.) Sullivan was content with that decision. (*See id.* at PageID 2080–82, 2182.) Sullivan did not ask anyone in the FCMC administration about Barry's purported lawsuit, nor did she ask Barry. (*Id.* at PageID 2082, 2183.) Sullivan simply assumed that the lawsuit existed. (*See id.* at PageID 2078–82.) From Sullivan's perspective, there was a history in the FCMC of

18

judicial secretaries who made complaints or were considered "troublemakers" being sent to the probation department. (*Id.* at PageID 2084.)

On November 5, 2013, Sullivan started to keep a running account of her interactions with Barry. (Sullivan Dep. at PageID 2177–78.) Sullivan met with Barry that day. (Sullivan Notes at PageID 2285 [ECF No. 82-8].) Barry confided in Sullivan that the situation at the court "was beginning to be too much because she is so depressed." (*Id.*) Barry explained that "everything was fine here until 'he' had caused so many problems and [that] she just couldn't stand it any[more]." (*Id.*) Typically, Sullivan would have asked a subordinate in Barry's position for more information about the issues troubling her. (Sullivan Dep. at PageID 2184.) But given her belief that Barry had sued the court, Sullivan's response was not typical. (*See id.*) Sullivan responded curtly: "Well, I don't know anything about that, and I'm not asking." (Sullivan Notes at PageID 2285.) Sullivan also declined to inquire about Barry's troubles when, on November 11, 2013, Barry attempted to speak with Sullivan about her deteriorating mental health. *Id.* at PageID 2287; Sullivan Dep. at PageID 2194.)

During her time as an SRO, at least two secretary positions opened up at the FCMC—a temporary Service Bailiff Secretary position and a part-time Small Claims Secretary position. (*See* Dec. 16, 2013 Emails at PageID 1669 [ECF No. 80-10]; FCMC Personnel Update at PageID 2935, 2940 [ECF No. 101-3].) Barry was not informed of either position. (*See* Dec. 16, 2013 Emails at PageID 1669; Barry Decl. at 3 [ECF No. 104].)

Barry began taking more time off work as her mental health deteriorated. She was admitted to Dublin Springs Hospital for her depression in December 2013 and again in January 2014. (*See* Barry Dep. Part 1 at PageID 2732 [ECF No. 97-1]; Barry Timeline at PageID 3176–77 [ECF No. 107-4].) Barry was also briefly admitted, in July 2014, to the Florida Center for

19

Recovery for her depression. (*See* Barry Dep. Part 1 at PageID 2732; Barry Timeline at PageID 3178.) After her FMLA allotment was exhausted, Barry began taking leave without pay. (FCMC Time Clock at PageID 2687–89 [ECF No. 96-3].)

On May 31, 2014, Sullivan issued an Employee Performance Review for Barry containing "Needs Improvement" ratings in eight out of nine performance competencies. (May 31, 2014 Evaluation at PageID 2271–75 [ECF No. 82-4].) Barry's ratings were the result of, among other issues, her taking so much medical leave, her purported inability to retain her training, and her alleged insubordinate behavior toward Sullivan. (*See id.*; Sullivan Dep. at PageID 2221.) Under the FCMC's procedures, this evaluation was accompanied by a WIP, which, in turn, mandated a 60 day follow-up evaluation. (May 31, 2014 WIP at PageID 2276–79 [ECF No. 82-5].)

In the intervening 60 days, Sullivan did not formally counsel Barry on how she could improve her performance. (*See* Sullivan Dep. at PageID 2242–43.)  Sullivan's follow-up evaluation of Barry, prepared on July 31, 2014, contained one "Unsatisfactory" rating, one "Unacceptable" rating, three "Needs Improvement" ratings, and one "Meets Standards" rating. (July 31, 2014 Evaluation at PageID 2282–84 [ECF No. 82-7].) Sullivan never actually had the opportunity to present this follow-up evaluation to Barry. (Sullivan Dep. at PageID 2244.) Nevertheless, as both Sullivan and Roth have testified, by August 2014, Barry had no future in the probation department. (*Id.* at PageID 2251; Roth Dep. at PageID 1648 [ECF No. 80-1].)

In early August 2014, Barry applied for a receptionist position. (Barry Timeline at PageID 3178 [ECF No. 107-4].) On August 19, as the interview for the receptionist position approached, Sullivan called Barry into her office and informed her that Judge O'Grady would be participating in the interview process. (*Id.*) Hours later, Barry was informed that there had been a

misunderstanding: Judge O'Grady would not actually be participating in the interview process. (*Id.*) The shock of believing, even temporarily, that Judge O'Grady would be attending the interview caused Barry to suffer a nervous breakdown. (*See id.*) She was hospitalized at Dublin Springs the next day. (Barry Decl. at 4 [ECF No. 104].) Barry has not returned to work since August 19, 2014. (*Id.*)

**B.      Procedural Background**

Barry brought this case on December 20, 2014. (Compl. at 1 [ECF No. 1].) She has subsequently filed two amended complaints. And she has requested leave to file a Third Amended Complaint in a motion currently before the Court. (Mot. for Leave at 1 [ECF No. 103].)

Barry has sued Judges Glaeden, Green, and O'Grady, as well as Emily Shaw and Michael Roth. (*See* 2nd Am. Compl. ¶¶ 2–4, 13.)[4] Barry asserts six claims: (1) First Amendment Retaliation: Conspiracy/Concerted Action against each of the Defendants, except Roth; (2) First Amendment Retaliation against Shaw; (3) First Amendment Retaliation against Green and Glaeden; (4) First Amendment Retaliation against O'Grady; (5) First Amendment Retaliation against Roth; and (6) Equal Protection Gender Discrimination against each of the Defendants. (*Id.* ¶¶ 54–78.)

Plaintiff has moved for summary judgment as to each of Barry's claims. (Mot. for Summ. J. at 1 [ECF No. 75].) Barry responded [ECF No. 108] to the Motion for Summary Judgment, and Defendants filed a Reply [ECF No. 112]. Soon after Defendants submitted their Reply,

---

[4] Roth's status as a defendant is somewhat uncertain given that Barry, in her Reply in support of her Motion to Transfer and Consolidate the case, represented that she would not pursue any claims against Roth. (Reply in Supp. of Mot. to Transfer & Consolidate at 2 n.1 [ECF No. 72].) Barry, however, has since argued in her Response to Defendants' Motion for Summary Judgment that Roth is liable to her and that the Court should allow her claims against him to proceed to trial. (*See* Resp. to Mot. for Summ. J. at 77–82 [ECF No. 108].) Based on her Response, the Court assumes that Barry, contrary to her prior representation, still intends to pursue her claims against Roth.

Barry filed an additional document [ECF No. 113] captioned as her Objections to certain allegations contained in the Reply; the document is, alternatively, a Motion to Strike. (Objections & Mot. to Strike at 1 [ECF No. 113].)

## II. MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (The requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts."). Consequently, the central issue is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

that one party must prevail as a matter of law.'" *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52).

Barry brings her claims under 42 U.S.C. § 1983, which provides a remedy for "the deprivation of rights, privileges, or immunities secured by the Constitution and laws" with respect to actions taken by persons acting "under color of any statute, ordinance, regulation, custom, or usage, of any State." 42 U.S.C. § 1983. To prevail on a claim brought under § 1983, a plaintiff must prove (1) that she was deprived of a right secured by the Constitution or laws of the United States and (2) that the deprivation was caused by a person acting under color of law. *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015). When suing an individual for a constitutional violation under § 1983, a plaintiff must demonstrate that the actor "'directly participated' in the alleged misconduct, at least by encouraging, implicitly authorizing, approving or knowingly acquiescing in the misconduct, if not carrying it out himself." *Flagg v. City of Detroit*, 715 F.3d 165, 174 (6th Cir. 2013) (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)).

## A.      Fourteenth Amendment Equal Protection Claims

Barry has sued Shaw, Roth, and Judges O'Grady, Glaeden, and Green under the Equal Protection Clause of the Fourteenth Amendment. (2nd Am. Compl. at 15–16 [ECF No. 46].) In her Response to Defendants' Motion for Summary Judgment, Barry insists that her cause of action under the Equal Protection Clause actually encompasses three distinct claims: (1) a sexual harassment, hostile work environment claim; (2) a constructive discharge claim; and (3) a retaliation claim. The Court begins by analyzing Barry's sexual harassment claim. (*See* Resp. to Mot. for Summ. J. at 57 [ECF No. 108].)

### 1.    Sexual Harassment

Sexual harassment is a specialized type of equal protection, gender discrimination claim. A sexual harassment claim brought under § 1983, and based upon a hostile work environment created by a supervisor, involves four elements: a plaintiff must show that "(1) she was a member of a protected class; (2) she was subject to unwelcomed sexual harassment; (3) the harassment was based on her sex; and (4) the harassment created a hostile work environment." *Hickman v. Laskodi*, 45 F. App'x 451, 453 (6th Cir. 2002) (quoting *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999)); *see also Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir. 1988) ("[T]he showing a plaintiff must make to recover on a disparate treatment claim under Title VII mirrors that which must be made to recover on an equal protection claim under section 1983.").

Sexual harassment encompasses "'discriminatory intimidation, ridicule, and insult,'" among other objectionable behaviors. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)). And despite its name, sexual harassment "need not be overtly sexual in nature" to be actionable. *Williams*, 187 F.3d at 565 ("[H]arassing behavior that is not sexually explicit but is directed at women and motivated by discriminatory animus against women satisfies the 'based on sex' requirement."); *see also Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 500 (6th Cir. 2009) ("[S]exual animus can be inferred from conduct not overtly sexual in nature when the context suggests it."). Sexual harassment encompasses any harassing conduct that is "based on sex." *Williams*, 187 F.3d at 565. And to establish that harassment "was 'based on her sex,' [a plaintiff] 'must show that but for the fact of her sex, she would not have been the object of harassment.'" *Farra v. Gen. Motors Corp.*, 163 F. Supp. 2d 894, 906 (S.D. Ohio 2001) (quoting *Williams*, 187 F.3d at 565).

24

Sexual harassment creates a hostile work environment when it is "'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris*, 510 U.S. at 21 (quoting *Meritor Savings Bank*, 477 U.S. at 67); *see Hickman*, 45 F. App'x at 454. There is both an objective and a subjective element to the existence of a hostile work environment: "the conduct must be severe enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000). In determining whether conduct is severe or pervasive enough to constitute a hostile work environment, a court should consider, among other factors, "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Hickman*, 45 F. App'x at 454 (quoting *Bowman*, 220 F.3d at 463) (internal quotation marks omitted). Ultimately, whether a hostile work environment exists is a determination based on the totality of the circumstances. *Harris*, 510 U.S. at 23; *Williams*, 187 F.3d at 562.

Lastly, when considering the viability of a sexual harassment claim, "it is important to distinguish between harassment and *discriminatory* harassment." *Bowman*, 220 F.3d at 464 (emphasis added). The Equal Protection Clause is not a general civility code. *See id.* Although non-overtly sexual conduct can be considered in the hostile work environment analysis, *see Williams*, 187 F.3d at 565, such conduct should only be considered when the plaintiff has also alleged conduct that could evince animus toward the gender in question. *See Bowman*, 220 F.3d at 464 ("Bowman has not shown that the non-sexual conduct he complains of had anything to do

25

with his gender. While he may have been subject to intimidation, ridicule, and mistreatment, he has not shown that he was treated in a discriminatory manner because of his gender.").

Defendants have moved for summary judgment on Barry's sexual harassment claim. According to Defendants, the harassment allegedly suffered by Barry, even when viewed in the light most favorable to her, was not severe or pervasive enough to create a hostile work environment. (*See, e.g.*, Mot. for Summ. J. at 40 [ECF No. 75]; Reply in Supp. of Mot. for Summ. J. at 7–8 [ECF No. 112].) Defendants also argue that any harassment that Barry purportedly suffered was not based on sex. (*See, e.g.*, Mot. for Summ. J. at 40; Reply in Supp. of Mot. for Summ. J. at 8, 15–16, 23, 34.) The Court starts with Barry's claim against Judge O'Grady.

### a. Judge O'Grady

Defendants argue, as a preliminary matter, that the two-year statute of limitations for a § 1983 action arising in Ohio bars the Court from considering any of Judge O'Grady's alleged conduct that occurred prior to December 20, 2012. (Mot. for Summ. J. at 29, 40 [ECF No. 75].) This argument fails, though, given that Barry asserts a hostile work environment claim, which, as the Supreme Court has explained, "will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002); *see also Sharpe v. Cureton*, 319 F.3d 259, 267 (6th Cir. 2003) (extending the Supreme Court's *Morgan* ruling to § 1983 claims). Judge O'Grady's conduct predating December 20, 2012, is part of the same purported unlawful employment practice as his conduct after that date: it is all part of his alleged sexual harassment of Barry. The Court moves now to the merits of Barry's claim.

According to Barry, Judge O'Grady sexually harassed her through the creation of a hostile work environment by (i) loudly laughing and joking with Amy Frank and Joye Saunders about sexually explicit topics, such as anal sex, (ii) using the word "fuck" on a daily basis, (iii) referring to people as "fucking idiot[s]," (iv) stating, once, that a female attorney was "smoking hot" and ruminating: "if I wasn't married"; (v) referencing attire, such as short skirts; (vi) stating, at least once, that a woman "was a bitch," (vii) occasionally asking Barry questions about her dates; (viii) torpedoing a woman's application for promotion because of his concern that she could not "even form a fucking sentence"; (ix) laughing when Saunders read excerpts depicting sex acts from *Fifty Shades of Grey*; (x) laughing about a female attorney's purported sexual conduct and three driving while impaired convictions, and, in the context of that discussion, remarking about the attorney "being good at what she does"; (xi) interacting with Barry in a hostile, angry manner following the attorney incident; (xii) presenting an Employee Performance Evaluation containing three "Needs Improvement" ratings to Barry in a hostile, angry manner; and (xiii) pushing a buzzer, monitored by Barry, to enter the magistrate chambers and then, while whistling, walking slowly by and glancing at Barry through a glass wall. (*See* Apr. 18, 2013 Evaluation at PageID 2600–04 [ECF No. 91-1]; Barry Decl. at 2 [ECF No. 104]; Barry Dep. Part 1 at PageID 2741–47, 2776–79, 2782–88, 2816 [ECF No. 97-1]; Barry Dep. Part 2 at PageID 3063, 3067–69, 3101–02 [ECF No. 102].)

Some of Judge O'Grady's alleged harassing conduct is overtly sexual. This evidence includes sexually explicit statements, like Frank's comment about the female attorney "lick[ing] [the male attorney] like a lap dog" or Judge O'Grady's remark about the female attorney "being good at what she does." (*See* Barry Dep. Part 1 at PageID 2776–78.) It includes Judge O'Grady's occasional use of the gender-specific expletive, "bitch," when referring to women. (*Id.* at PageID

2746.) And it includes Judge O'Grady's assertion that a female attorney was "smoking hot," followed by his statement: "[I]f I wasn't married." (*Id.* at PageID 2744.) The Court properly considers this conduct in its hostile work environment analysis.

Other conduct that Barry cites in support of her sexual harassment claim is not overtly sexual. Judge O'Grady, for example, said "fuck" on a daily basis and frequently referred to people as "fucking idiots."[5] (Barry Dep. Part 1 at PageID 2744–45.) Judge O'Grady also referenced attire, such as short skirts; he torpedoed a woman's application for promotion; he occasionally asked Barry questions about her dates; he interacted with Barry in a hostile and angry manner following the attorney incident and during the April 18 Employee Performance Evaluation; and he occasionally pushed a buzzer to access the magistrate chambers and then walked by Barry's workstation. (Barry Dep. Part 1 at PageID 2744, 2746–47, 2799, 2816; Barry Dep. Part 2 at PageID 3063, 3067–69.)

This non-overtly sexual conduct is still relevant to Barry's claim. As both the Supreme Court and the Sixth Circuit have instructed, the Court must consider the totality of the circumstances when considering the existence of a hostile work environment. *Harris*, 510 U.S. at 23; *Williams*, 187 F.3d at 562 ("[T]he totality-of-the-circumstances test must be construed to mean that even where individual instances of sexual harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a . . . violation."). And here, given the various overtly sexual and gender-specific statements Judge O'Grady allegedly made—including statements like "bitch," that could evince animus toward females—

---

[5] Profane statements are employed in a variety of contexts, and many of those contexts are non-sexual. *See Socks-Brunot v. Hirschvogel Inc.*, 184 F.R.D. 113, 123 (S.D. Ohio 1999) ("If a plaintiff used the words 'damn' or 'hell' in regular conversation, such profanities connote no sexual overtones . . . ."). Although "fuck" carries a sexual connotation in some usages, there is no evidence here to suggest that Judge O'Grady employed the word in a sexually charged way. *Cf. id.* ("[A] generalized use of the 'f' word, while offensive to many, may not have any linguistic or practical association with sex-based speech.").

the Court properly considers all of Judge O'Grady's conduct in its hostile work environment analysis. *See Jordan v. City of Cleveland*, 464 F.3d 584, 596 (6th Cir. 2006) ("'[F]acially neutral abusive conduct can support a finding of . . . animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly . . . discriminatory conduct.'") (quoting *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999)); *cf. Jackson v. Quanex Corp.*, 191 F.3d 647, 661 (criticizing the district court for eschewing the totality of the circumstances approach when the district court "discounted evidence of harassment . . . that had 'no racial components in the description'").

Defendants, as noted above, contend that the harassment allegedly suffered by Barry was not based on sex. (*See* Mot. for Summ. J. at 40 [ECF No. 75].) But, again, given the various overtly sexual and gender-specific statements Judge O'Grady allegedly made, the Court concludes that a reasonable jury could find that Barry's gender was a but-for cause of Judge O'Grady's conduct.

Defendants also argue that Judge O'Grady's conduct could not have created a hostile work environment. (*See* Mot. for Summ. J. at 38–40.) The Court disagrees. Through its analysis of all the circumstances surrounding Barry's allegations, the Court concludes that Judge O'Grady's purported conduct could be considered sufficiently severe or pervasive for a reasonable jury could find the existence of a hostile work environment.

To be clear, most of the evidence supporting Barry's sexual harassment claim involves Judge O'Grady's offensive utterances. Barry is alleging sexual harassment, but she does not claim that he physically threatened her, requested sexual favors, or subjected her to unwanted physical contact. This fact weighs slightly against the objective severity of Judge O'Grady's conduct. But contrary to Defendants' suggestion, (*see* Mot. for Summ. J. at 39 [ECF No. 75]),

vulgar and demeaning statements can sustain a sexual harassment claim when those statements are based on sex and are severe or pervasive. *See Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 274 (6th Cir. 2009) ("Considering the totality of the circumstances as described in [the plaintiff's] deposition, the conclusion is inescapable that a reasonable person could have found the Cleveland office—permeated with vulgar language, demeaning conversations and images, and palpable anti-female animus—objectively hostile."). And here, given the pervasiveness of Judge O'Grady's alleged conduct, coupled with the alleged conduct's offensiveness and plausible hostility toward females, a reasonable person could find Judge O'Grady's alleged conduct hostile and abusive.

Barry alleges that Judge O'Grady exposed her to a nonstop barrage of profanity. "Fuck," "idiot," and a combination of those words, allegedly came out of Judge O'Grady's mouth nearly every sentence he uttered. (*See* Barry Dep. Part 1 at PageID 2744–45 [ECF No. 97-1].)  And peppered throughout this pervasive stream of profanity and insults were statements and behaviors that could reasonably evince an animus against females. Judge O'Grady allegedly referred to a woman as a "bitch." (*See id.* at PageID 2746.) He purportedly stated that a female attorney was "smoking hot" and then ruminated: "if I wasn't married." (*Id.* at PageID 2744.) He allegedly referenced short skirts. (*Id.*) He allegedly asked Barry probing and personal questions about her dates. (*See id.* at PageID 2746.)  He purportedly engaged in conversations with the bailiffs about anal sex. (*Id.* at PageID 2743; Barry Decl. ¶ 3 [ECF No. 104].) He supposedly opined that a female applicant for promotion couldn't "even form a fucking sentence." (*See* Barry Dep. Part 1 at PageID 2747.) And he allegedly laughed when Saunders read excerpts depicting sex acts from *Fifty Shades of Grey*. (Barry Dep. Part 2 at PageID 3101–02 [ECF No. 102].)

In addition to this frequent exposure to demeaning and lewd commentary, Barry was also a captive audience to the offensive, and likely sex-based, gossip directed at the female attorney. Judge O'Grady and the bailiffs allegedly laughed about the attorney licking a male attorney "like a lap dog," about anal sex ("it was an exit only, and nothing entered in"), about the female attorney supposedly having sex with two male attorneys in one day, about the female attorney "being good at what she does," and about the female attorney's impaired driving convictions. (*See* Barry Dep. Part 1 at PageID 2776–79.)

Defendants note that Judge O'Grady and the bailiffs directed some of this profanity at individuals other than Barry. (Barry Dep. Part 1 at PageID 2746.) Although this weighs slightly against the severity of Judge O'Grady's alleged conduct, it does nothing to diminish its pervasiveness. And although there is no evidence to suggest that Judge O'Grady and the bailiffs directed their commentary at Barry, there is also no evidence to suggest that they took efforts to make their offensive comments outside of Barry's hearing range or to conduct their insulting conversations in a private location. *See Gallagher*, 567 F.3d at 273 ("Whether the offensive conduct was intentionally directed specifically at Gallagher or not, the fact remains that she had no means of escaping her co-workers' loud insulting language and degrading conversations; she was unavoidably exposed to it."). Rather, Barry indicated in her deposition that Judge O'Grady and the bailiffs would converse in chambers, near her workstation, with Judge O'Grady seated in a chair by the window. (*See* Barry Dep. Part 1 at PageID 2745.) The Court notes, moreover, that not all of Judge O'Grady's alleged conduct was directed at other individuals. Judge O'Grady directed his actions at Barry when he purportedly (i) asked about Barry's dates, (ii) behaved in an angry and hostile manner after the female attorney incident (and during the performance

31

evaluation), and (iii) used a buzzer to request access to the magistrate chambers on the 11th Floor.

Defendants point out that Barry, in her November 14, 2012 Facebook post, used some of the same profanity that she complains about Judge O'Grady using. (*See* Barry Facebook Post at PageID 657 [ECF No. 75-11].) Defendants insinuate that Barry could not have subjectively regarded her workplace as abusive given her own language use. (*See* Mot. for Summ. J. at 38–39 [ECF No. 75].) With this argument, Defendants overlook the context of each situation. In a Facebook post to her friends, made after work hours, Barry included several curse words. Judge O'Grady, by contrast, is alleged to have used profanity at work, in nearly every sentence he formed, and in the presence of a subordinate who had minimal ability, if any, to opt out of hearing his comments. And this is in addition to Judge O'Grady's other alleged behavior. Barry's use of profanity in a Facebook post does not disqualify her, as a matter of law, from finding Judge O'Grady's conduct abusive.

Also supporting the Court's conclusion that a reasonable jury could find the alleged conduct severe or pervasive is the evidence Barry has presented demonstrating that Judge O'Grady's purported conduct unreasonably interfered with her work performance. Barry has testified that Judge O'Grady's conversations with Frank and Saunders were often so loud that she "couldn't hear phone calls." (Barry Dep. Part 1 at PageID 2743 [ECF No. 97-1].) And more significantly, Judge O'Grady's behavior contributed to Barry's anxiety, emotional distress, and depression—all of which impacted her ability to work. (*See, e.g., id.* at PageID 2722–24; Barry Decl. ¶¶ 4, 7, 15 [ECF No. 104]; Barry Medical Notes at PageID 3168–72 [ECF Nos. 107-1, 107-2]; Sullivan Notes at PageID 2285 [ECF No. 82-8].) Barry, for example, confided to Sullivan, her supervisor in the probation department, that the situation at the court "was

32

beginning to be too much because she [was] so depressed." On why she was depressed, Barry

added: "everything was fine here until 'he' [i.e., Judge O'Grady] . . . caused so many problems."

(Sullivan Notes at PageID 2285.) Barry's mental health condition was so affected by Judge

O'Grady's alleged harassment that she was admitted to Dublin Springs Hospital, a psychiatric

and mental health facility, on several occasions, and to the Florida Center for Recovery. (Barry

Dep. Part 1 at PageID 2732; Barry Timeline at PageID 3176–78 [ECF No. 107-4].) This

evidence lends considerable support to the existence of a hostile work environment.

Defendants argue that Barry was hospitalized because of her alcohol use. (Reply in Supp.

of Mot. for Summ. J. at 41 [ECF No. 112].) They imply that alcohol use, rather than Judge

O'Grady's alleged conduct, interfered with her attendance and work performance. (*See id.* at 40–

41.) But given that Barry has presented evidence indicating that her work performance suffered

due to her depression caused by Judge O'Grady's conduct, (*see, e.g.*, Barry Decl. ¶¶ 4, 7, 15;

Barry Medical Notes at PageID 3168–72; Sullivan Notes at PageID 2285), Defendants'

argument creates, at most, an issue of fact for the jury to resolve.

Viewed collectively, and in the light most favorable to Barry, Judge O'Grady's alleged

conduct was severe and pervasive enough to create an environment that a reasonable person

could find hostile or abusive. *See Jordan*, 464 F.3d at 597 ("Whether conduct is severe or

pervasive is 'quintessentially a question of fact.'") (quoting *O'Shea*, 185 F.3d at 1098). And the

evidence also suggests that Barry did, in fact, regard the environment as abusive. A reasonable

jury could, consequently, find that Judge O'Grady subjected Barry to unwanted harassment,

based on her sex, that created a hostile work environment. Judge O'Grady's request for summary

judgment on Barry's sexual harassment claim is, therefore, denied.[6]

---

[6] Given the Court's conclusion that the evidence outlined above creates a genuine issue of material fact on
whether Judge O'Grady sexually harassed Barry through the creation of a hostile work environment, the

      **b.**    **Shaw and Judges Green and Glaeden**

The Court next considers Barry's sexual harassment claims against Shaw and Judges Green and Glaeden. Barry contends that Shaw, Green, and Glaeden facilitated Judge O'Grady's sexual harassment. (2nd Am. Compl. ¶ 76 [ECF No. 46].) This is not a winning argument.

Barry has not presented any evidence demonstrating that Shaw, Green, or Glaeden knew about Judge O'Grady's alleged harassment prior to May 7, 2013. Barry's facilitation argument is, thus, limited to Shaw, Green, and Glaeden's alleged facilitation of any harassment that occurred from May 7 onward.

Judge O'Grady's only alleged harassment that falls within this period are his visits to the magistrate chambers, when he would buzz at the door, walk by Barry's workstation, and glance at her through a glass wall. (*See* Barry Dep. Part 2 at PageID 3067–69 [ECF No. 102].) Barry, however, has not presented any evidence that Shaw, Green, or Glaeden facilitated this behavior. Barry informed Shaw about Judge O'Grady's presence on the 11th Floor. (*See* Sept. 6, 2013 Barry Email to Shaw at PageID 2617 [ECF No. 91-6].) Shaw, in turn, informed Judge Green about the visits. (*See* Shaw Dep. at PageID 1917 [ECF No. 81-1].) Shaw also inquired of Administrative Magistrate Graham about the visits. (*Id.* at PageID 1921.) As to Judge Glaeden, Barry has not presented evidence to suggest that she even knew about the visits.

Viewing the evidence in the light most favorable to her, Barry can establish, at most, that Shaw and Judge Green failed to adequately investigate Judge O'Grady's trips to the 11th Floor. This is insufficient, though, to create a genuine issue of material fact on whether these Defendants sexually harassed Barry. *See Flagg*, 715 F.3d 165 at 174 (To establish an individual

Court need not consider the relevance of some of Barry's additional evidence, namely the experiences of Andrea Boxill, the former coordinator of the FCMC's Specialized Docket, and a letter written by Judge Scott Vanderkarr. (*See* Resp. to Mot. for Summ. J. at 61 [ECF No. 108].)

actor's liability for constitutional violations under § 1983, "it is not enough to show that the actor failed to act against misconduct of which he was aware.").

Barry also implies that Shaw and Judges Green and Glaeden may have engaged in some actions on their own that support a sexual harassment claim. (*See* 2nd Am. Compl. ¶ 76; Resp. to Mot. for Summ. J. at 69–77 [ECF No. 108].) But rather than cite actions that might support a sexual harassment claim against them, Barry points to actions taken by those Defendants purportedly as retaliation for Barry's complaints against Judge O'Grady. (*See* Resp. to Mot. for Summ. J. at 69–77.) Barry offers no connection between these alleged retaliatory acts and her gender. (*See id.*) Shaw and Judges Green and Glaeden are, thus, each entitled to summary judgment on Barry's sexual harassment claim.

### c. Roth

Barry insists that Roth sexually harassed her through his facilitation of Judge O'Grady's harassment. (*See* 2nd Am. Compl. ¶ 77.) As explained above, though, this theory is limited to the facilitation of Judge O'Grady's visits to the magistrate chambers. And Barry has not presented any evidence to suggest that Roth facilitated, or even knew about, those visits.

Barry also argues that Roth sexually harassed her through his creation of a hostile work environment in the probation department. (*See* 2nd Am. Compl. ¶ 77.) According to Barry, Roth conspired to retaliate against her because she complained about Judge O'Grady's behavior. (*See* Resp. to Mot. for Summ. J. at 77–82.)  Roth purportedly lied to Barry about the existence of an SRO position. (*Id.* at 78.) And Roth purportedly knew about Barry's difficult experience in the probation department. (*See id.*)

Barry's arguments fall flat. Barry has produced no evidence demonstrating Roth's direct participation in the creation of the purported hostile work environment in the probation

department. *See Flagg*, 715 F.3d 165 at 174. Barry, moreover, has not produced any evidence from which a reasonable jury could conclude that she suffered harassing conduct *based on her gender* while in the probation department. Barry has also failed to produce evidence establishing that the harassment she purportedly suffered in the probation department was objectively severe or pervasive enough to constitute a hostile work environment. The probation department was, according to Barry, a dirty place to work. (*See* Barry Dep. Part 1 at PageID 2887–88 [ECF No. 97-1].) Her work there began with confusion over whether she was an SRO or a receptionist. (*See* Sullivan Dep. at PageID 2167–68 [ECF No. 82-1].) And after that confusion was resolved, her time in the probation department entailed frequent scrutiny from her supervisor and the completion of mindless tasks. (*See* Ceneskie Decl. at PageID 2646–49 [ECF No. 92-1].) These experiences, although unpleasant, do not evidence gender-based harassment, nor were they pervasive or severe. As such, Roth is entitled to summary judgment on Barry's sexual harassment claim.

### 2. Constructive Discharge

Barry contends that Defendants constructively discharged her. (*See* Resp. to Mot. for Summ. J. at 57 [ECF No. 108].) A plaintiff's assertion of constructive discharge "stems from, and can be regarded as an aggravated case of, sexual harassment or hostile work environment." *Pa. State Police v. Suders*, 542 U.S. 129, 146 (2004) (explaining that, in addition to the existence of a hostile work environment, a claim of constructive discharge "entails something more": evidence that "working conditions [were] so intolerable that a reasonable person would have felt compelled to resign"). "Constructive discharge from employment is not itself a cause of action. First there must exist an underlying cause of action for employment discrimination." *Keaton v. Ohio*, No. C2-00-1248, 2002 WL 1580567, at *12 (S.D. Ohio June 3, 2002); *see also Pa. State*

36

*Police*, 542 U.S. at 149 ("Creation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case.").

To assert a claim based on constructive discharge, a plaintiff must first present evidence establishing an underlying discrimination claim; she must then show that she was constructively discharged, which she can do by producing evidence demonstrating that "(1) 'the employer . . . deliberately create[d] intolerable working conditions, as perceived by a reasonable person,' (2) the employer did so 'with the intention of forcing the employee to quit,' and (3) 'the employee . . . actually quit.'" *Savage v. Gee*, 665 F.3d 732, 736, 739 (6th Cir. 2012) (quoting *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999)).

As a preliminary matter, Barry contends that Defendants have not actually moved for summary judgment on her constructive discharge claim. (*See* Resp. to Mot. for Summ. J. at 57.) The Court agrees. Defendants state on the first page of their Motion for Summary Judgement that they are moving "for summary judgment as to all claims." (Mot. for Summ. J. at 1 [ECF No. 75].) But aside from offering this generalized assertion, Defendants make no effort to address Barry's constructive discharge claim in their Motion. Defendants do not outline the law applicable to a constructive discharge claim, nor do they analyze the evidence relevant to a determination of whether Barry actually quit her job. (*See generally id.*) Not once do Defendants even use the phrase "constructive discharge" in their Motion. (*See generally id.*) Defendants only address Barry's constructive discharge claim in their Reply. (Reply in Supp. of Mot. for Summ. J. at 42 [ECF No. 112].) But as this Court has explained, "'a reply brief is not the proper place to raise an issue for the first time.'" *NetJets Large Aircraft, Inc. v. United States*, 80 F. Supp. 3d 743, 765 (S.D. Ohio 2015) (quoting *United Tel. Co. of Ohio v. Ameritech Servs., Inc.*, No. 2:10-cv-249, 2011 WL 53462, at *3 n.2 (S.D. Ohio Jan. 7, 2011)). Because Defendants have not

37

properly moved for summary judgment on Barry's constructive discharge claim, their summary judgment request on the claim is denied.

### 3.      Retaliation

Barry insists that she can bring a retaliation claim under the Fourteenth Amendment's Equal Protection Clause. (*See* Resp. to Mot. for Summ. J. at 57–59 [ECF No. 108].) She points to *Thompson v. The Ohio State University*, 990 F. Supp. 2d 801, 814–16 (S.D. Ohio 2014), a decision in which this Court denied a motion to dismiss an Equal Protection claim brought under § 1983. In addition to alleging that the defendants discriminated against her on the basis of race, the plaintiff in *Thompson* alleged that one of the defendants "pursued charges against [her] . . . in retaliation for [her] having complained of race discrimination perpetrated by [one of the other defendants]." *Thompson*, 990 F. Supp. 2d at 815.

As the Sixth Circuit reaffirmed just last year, though, "[a] 'retaliation claim does not . . . arise under the Equal Protection Clause.'" *Smith v. City of Inkster*, 644 F. App'x 602, 611 (6th Cir. 2016) (quoting *R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 440 (6th Cir. 2005)); *see also Watkins v. Bowden*, 105 F.3d 1344, 1354 (11th Cir. 1997) ("A pure or generic retaliation claim . . . simply does not implicate the Equal Protection Clause."); *Gray v. Lacke*, 885 F.2d 399, 414 (7th Cir. 1989) ("Gray's right to be free from retaliation for protesting sexual harassment and sex discrimination is a right created by Title VII, not the equal protection clause."); *Collins v. Allen*, No. 1:04-cv-572, 2006 WL 2505928, at *2 (S.D. Ohio Aug. 29, 2006) ("[Plaintiff's] claim against [the defendant] is for retaliation, for which the equal protection clause does not provide a remedy.").

In support of the notion that she can bring a retaliation claim under the Equal Protection Clause, Barry cites several cases involving retaliation claims brought under Title VII. (*See* Resp.

to Mot. for Summ. J. at 57–59.) Given, however, that Barry has not asserted a claim under Title VII, those cases are inapposite. (*See* 2nd Am. Compl. at 12–16 [ECF No. 46].)

Barry, in sum, cannot bring a retaliation claim under the Equal Protection Clause. To the extent that she attempts to bring such a claim, Defendants are entitled to summary judgment on it. Barry's allegations regarding Defendants' retaliatory conduct are appropriately evaluated under the First Amendment. *See R.S.W.W.*, 397 F.3d at 439 ("To the extent that Goose Island alleges that government officials retaliated against it for accessing the courts, that claim arises under the First Amendment."); *see also Ratliff v. DeKalb Cnty.*, 62 F.3d 338, 340 (11th Cir. 1995) (reversing denial of qualified immunity on equal protection retaliation claim because "[t]he right to be free from retaliation [for making complaints of discrimination] is clearly established as a *first amendment* right and as a *statutory* right under Title VII; but no clearly established right exists under the *equal protection* clause to be free from retaliation").

**B.      First Amendment Retaliation Claims**

Barry has sued Shaw, Roth, and Judges O'Grady, Green, and Glaeden for allegedly retaliating against her in violation of the First Amendment. Defendants, in turn, have each moved for summary judgment on Barry's retaliation claim. They argue that some of Barry's speech is not protected under the First Amendment; they insist that Barry did not suffer an adverse action; they challenge the causal connection between Barry's speech and the purported adverse actions she suffered; and they imply that they would have taken the same actions absent the protected conduct.

In the Sixth Circuit, First Amendment retaliation claims are analyzed under a burden-shifting framework. *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012). First, a plaintiff must establish a prima facie case of retaliation, which consists of three elements:

39

(1) the plaintiff engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against her that would deter a person or ordinary firmness from continuing to engage in the protected speech (or conduct); and (3) there is a causal connection between the first two elements—that is, the adverse action was motivated at least in part by the plaintiff's protected speech. *Id.* "If the employee establishes a prima facie case, the burden then shifts to the employer to demonstrate 'by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct.'" *Id.* (quoting *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 208 (6th Cir. 2010)). "'Once this shift has occurred, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant.'" *Id.* at 294–95 (quoting *Eckerman*, 636 F.3d at 208). For First Amendment retaliation claims—unlike claims analyzed under the *McDonnell Douglas* burden-shifting framework—the burden does not shift back to the plaintiff to show pretext. *Id.* at 295.

### 1. Prima Facie Case

#### a. Protected Speech

Barry asserts that she engaged in three instances of protected speech: (1) when she informed the female attorney that Judge O'Grady, Frank, and Saunders had been talking about her sex life; (2) when she called Shaw on May 7, 2013, to tell her about Judge O'Grady's alleged harassing conduct; and (3) when she submitted her grievance about Judge O'Grady to the Office of Disciplinary Counsel.

In determining whether a plaintiff has stated a prima facie case of retaliation, the Court must first discern whether the speech in question is constitutionally protected. *Dye*, 702 F.3d at 295. Speech is protected if it relates to a matter of "public concern," which, as the Supreme

40

Court has explained, encompasses "'any matter of political, social, or other concern to the community.'" *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)). "'[W]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record.'" *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 256–57 (6th Cir. 2006).

If a plaintiff's speech relates to a matter of public concern, the court must apply the *Pickering* balancing test "'to determine if the employee's free speech interests outweigh the efficiency interests of the government as an employer.'" *Dye*, 702 F.3d at 295 (quoting *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006)); *see Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty., Ill.*, 391 U.S. 563, 568 (1968). The balancing test involves various considerations, including "'whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speakers duties or interferes with the regular operation of the enterprise.'" *Dye*, 702 F.3d at 295 (quoting *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)).

### i. Conversation with the Female Attorney

Barry's conversation with the attorney who was the subject of personal gossip does not constitute protected speech. The context of that conversation indicates that it was not a matter of public concern. In her private Facebook message to the attorney, Barry simply informed her that she might want to be more careful with what she talks about with respect to her personal life. (Barry Dep. Part 1 at PageID 2783 [ECF No. 97-1].) And later, when the attorney stopped by chambers, Barry advised her that she should "be careful what [she] tell[s] people because . . . it gets around and it can be embarrassing." (*Id.* at PageID 2798.) Barry did not articulate any

41

concern over Judge O'Grady's impartiality or professionalism; she did not allude to any unease regarding the integrity of the court; nor did Barry express any apprehension over the attorney's position as an officer of the court or the attorney's continued ability to represent clients before Judge O'Grady. Barry thought that her friend, the attorney, should know about the jealous gossip emanating from their mutual acquaintances—Frank, Saunders, and Judge O'Grady. (*See* Barry Facebook Post at PageID 657 [ECF No. 75-11]; *see also* ODC Compl. at PageID 596 [ECF No. 75-7].) This was a matter of personal interest. Indeed, Barry expressed disbelief when the attorney decided to confront Judge O'Grady about his gossiping. In her deposition, Barry explained that she was just "trying to give [her] a heads-up that people were talking about her." (Barry Dep. Part 1 at PageID 2800; *see* ODC Compl. at PageID 596.) She added: "[I]f that was me, I wouldn't have done that." (Barry Dep. Part 1 at PageID 2800.) Barry's conversation with the female attorney did not relate to any matter of political, social, or other concern to the community. Consequently, it is not protected speech, and Defendants are entitled to summary judgment on Barry's retaliation claims to the extent that they rely on the conversation with the attorney as protected speech.

### ii.     Telephone Conversation with Shaw

Barry's May 7, 2013 telephone conversation with Shaw is, by contrast, protected speech. Defendants contend that this conversation did not relate to a matter of public concern because Barry called Shaw to advance a private interest: registering her dissatisfaction with her April 18, 2013 Employee Performance Evaluation. (Mot. for Summ. J. at 43 [ECF No. 75].) Granted, Barry did express her concern about the "Needs Improvement" ratings that she received. (*See* Barry Dep. Part 1 at PageID 2821–28; Shaw Notes at PageID 2626 [ECF No. 91-9].) But Barry also suggested that Judge O'Grady, along with Frank and Saunders, were sexually harassing her

through the creation of a hostile work environment in chambers. (*See* Barry Dep. Part 1 at PageID 2821–28; Shaw Dep. at PageID 1785; Shaw Notes at PageID 2626–28.) A sexual harassment allegation leveled against a municipal court judge is a matter of concern to the community. *See Bonnell v. Lorenzo*, 241 F.3d 800, 812 (6th Cir. 2001) ("[I]t is well-settled that allegations of sexual harassment[] . . . are matters of public concern."). And although Barry asserted this allegation through an internal channel at the FCMC rather than some type of external channel, this fact does not strip Barry's allegation of its interest to the public.

The *Pickering* balancing test weighs in favor of protecting Barry's speech. There is no evidence to suggest that Barry's conversation with Shaw impaired discipline by superiors. Barry's conversation may have impaired the harmony between her and her co-workers. Barry's conversation might have also had a detrimental impact on her working relationship with Judge O'Grady. Damage to personal relationships is expected, however, when a worker accuses her supervisor and co-workers of creating a hostile work environment. And bringing those harassment allegations to light far outweighs any interpersonal strain here. Barry's conversation may have also interfered with the regular operation of the FCMC. This interference was minimal, though, given that Barry was relocated to the magistrate chambers after she returned to work in early July 2013. The Court will, accordingly, treat Barry's May 7, 2013 telephone conversation with Shaw as constitutionally protected speech.

### iii.    ODC Grievance

The Court also concludes that Barry's July 3, 2013 ODC grievance is constitutionally protected speech. Again, a sexual harassment allegation leveled against a municipal court judge is a matter of public concern. *See Bonnell*, 241 F.3d at 812. And unlike Barry's conversation with Shaw, Barry's ODC grievance did not involve an internal communication. The *Pickering*

43

balancing test again weighs in favor of protecting Barry's speech. There is no evidence that Barry's ODC grievance impaired discipline by superiors or harmony among her co-workers. There is no evidence that the grievance impeded Barry's duties or interfered with the FCMC's operations. Nor is there evidence that Barry's grievance had a detrimental impact on close working relationships at the court: Barry was no longer working with Judge O'Grady when she filed the grievance. Barry engaged in protected speech when she filed her grievance with the ODC.

### b. Adverse Actions

The Court's next consideration—the second element of a prima facie case of retaliation—is whether Barry suffered an adverse action. In the employment context, "adverse action" typically refers to actions such as discharge, demotions, refusal to hire, nonrenewal of contracts, and failure to promote. *Thaddeus-X v. Blatter*, 175 F.3d 378, 396 (6th Cir. 1999). This is not an all-inclusive list, though. A court must tailor its analysis under the adverse action prong to the circumstances of the specific retaliation claim. *Dye*, 702 F.3d at 303. The key determination is whether the employer's action would deter a person of ordinary firmness from continuing to engage in First Amendment protected speech. *See Thaddeus-X*, 175 F.3d at 394, 396. And in most cases, this determination is a question of fact, "not amenable to resolution as a matter of law" through summary judgment. *Bell*, 308 F.3d at 603. "[U]nless the claimed retaliation is truly inconsequential, the plaintiff's claim should go to the jury." *Id.* (internal quotation marks omitted).

Barry claims that she suffered several adverse actions: (1) the imposition of a Work Improvement Plan ("WIP"); (2) the transfer to the SRO position in the probation department; (3) harassment in the probation department; (4) the transfer to the magistrate chambers; and (5)

harassment in the magistrate chambers. (*See* Resp. to Mot. for Summ. J. at 68–69, 74, 76, 78, 82 [ECF No. 108].)[7]

Barry has presented sufficient evidence to create a genuine issue of material fact on whether the imposition of a WIP is an adverse action. Most notably, Barry highlights language from the WIP indicating that her failure to meet the requirements of a WIP could result in her termination. (July 2, 2013 WIP at PageID 2613 [ECF No. 91-4].) The prospect of facing termination for failing to meet the requirements of a WIP could be sufficient to deter a person of ordinary firmness from continuing to engage in constitutionally protected speech.

Additionally, a genuine issue of material fact exists as to whether Barry's transfer to the SRO position in the probation department is an adverse action. An SRO has a very different job than a judicial secretary does. (*See* Barry Dep. Part 1 at PageID 2881–88 [ECF No. 97-1].) The jobs involve different skill sets and entail distinct responsibilities. (*See id.*) Barry had no training on how to perform the SRO position prior to her start in the probation department. (*See id.* at PageID 2886, 2890.) And she only started to receive training on numerous aspects of the job weeks after she began as an SRO. (*See id.*) SROs, moreover, engage in tasks that could be viewed as less intellectually stimulating and less professionally engaging than the tasks engaged in by judicial secretaries. (*See id.* at PageID 2881–88.) SROs also work in an arguably less pleasant environment than judicial secretaries do. (*See id.*) And although Barry's move to the SRO position did not involve a reduction in pay, Barry did move to a lower pay classification by

---

[7] Barry also argues that she suffered adverse actions in the form of (i) a hostile work environment in Judge O'Grady's chambers and (ii) the April 18, 2013 Employee Performance Evaluation. (*See* Resp. to Mot. for Summ. J. at 68.) Barry, however, purportedly suffered these adverse actions in retaliation for her November 2012 conversation with the female attorney. (*See id.*) And that conversation, as explained earlier, is not constitutionally protected speech. Moreover, Barry suffered these alleged adverse actions before she engaged in either of the two instances of protected speech that the Court has recognized (i.e., the May 7, 2013 conversation with Shaw and the July 3, 2013 ODC grievance). That is, even if the Court were to view the hostile work environment and the performance evaluation as adverse actions, Barry would be unable to establish the causal connection between them and her protected speech.

assuming the position, which limited her opportunities for future pay increases. (Shaw Dep. at PageID 1725 [ECF No. 81-1].) Transfer to the SRO position could deter a person of ordinary firmness from continuing to engage in protected speech.

A genuine issue of material fact also exists on whether the harassment Barry purportedly suffered in the probation department is an adverse action. Barry has presented evidence that despite her transfer to the SRO position she was, for weeks after her arrival at the probation department, working solely as a receptionist. (*See* Sullivan Dep. at PageID 2167–69 [ECF No. 82-1]; Ceneskie Decl. at PageID 2647 [ECF No. 92-1].) Barry worked with two other receptionists at a job station designed for two people. (*See* Barry Dep. Part 1 at PageID 2882–3.) Barry has presented evidence that she was tasked with doing nothing but purge files for several weeks. (Ceneskie Decl. at PageID 2647.) She has presented evidence showing that the supervisors in the probation department scrutinized her work more than they did with any other SRO's work. (*Id.* at PageID 2647–48.) Barry has also presented evidence showing that Sullivan was standoffish with her based on Sullivan's mistaken belief that she had already filed a lawsuit against the FCMC. (*See* Sullivan Dep. at PageID 2078, 2182, 2184–85, 2194.) Barry has presented evidence that she was not informed of two secretary positions that became available during her time as an SRO. (*See* Barry Decl. at 3 [ECF No. 104]; Dec. 16, 2013 Emails at PageID 1669 [ECF No. 80-10]; FCMC Personnel Update at PageID 2935, 2940 [ECF No. 101-3].) And Barry has presented evidence showing that on May 31, 2014, Sullivan issued her an Employee Performance Review containing eight "Needs Improvement" ratings. (May 31, 2014 Evaluation at PageID 2271–75 [ECF No. 82-4].) The performance review was accompanied by a WIP. (*See* May 31, 2014 WIP at PageID 2276–79 [ECF No. 82-5].) A person of ordinary

firmness could be deterred from continuing to engage in constitutionally protected speech as a result of this treatment.

In contrast to the adverse actions discussed above, Barry has failed to create a genuine issue of material fact regarding her transfer to the magistrate chambers. Barry has presented no evidence that she suffered a reduction of pay or that she suffered a diminishment in her pay classification. Barry presents no evidence that her job duties as a magistrate secretary were significantly different from or less fulfilling than her duties as a judicial secretary. She presents no evidence that the work environment on the 11th Floor was less agreeable than the environment in her former chambers. Barry, in fact, represents in her Response to Defendants' Motion for Summary Judgement that she "loved her assignment with the magistrates." (Resp. to Mot. for Summ. J. at 38 [ECF No. 108]; *see* Barry Dep. Part 1 at PageID 2857.) Although Barry would have preferred to remain in a judge's chambers, (*see* June 28, 2013 Shaw Email to Armitage at PageID 3173 [ECF No. 107-3]), no reasonable jury could, based solely on Barry's initial reluctance to move to the magistrate chambers, conclude that a person of ordinary firmness would be deterred from engaging in constitutionally protected speech as a result of this move to the magistrate chambers.

And Barry has also failed to create a genuine issue of material fact on whether the harassment she allegedly suffered in the magistrate chambers is an adverse action. No reasonable jury could conclude that a person of ordinary firmness would be deterred from engaging in constitutionally protected speech as a result of Judge O'Grady occasionally visiting the magistrate chambers and glancing at Barry through a glass wall. Defendants are entitled to summary judgment on Barry's First Amendment retaliation claims to the extent that the claims rely on her transfer to, and harassment in, the magistrate chambers as an adverse action.

c.      **Causal Connection**

Barry has identified two instances in which she engaged in constitutionally protected speech: when she called Shaw on May 7, 2013, and when she filed a grievance with the ODC on July 3, 2013. Barry has, in turn, identified three adverse actions that she allegedly suffered: imposition of a WIP; transfer to the SRO position; and harassment in the probation department.

To satisfy the last element of her prima facie retaliation case, Barry must produce evidence to establish a causal connection between her protected speech and the adverse actions she suffered. To establish this causal connection, a plaintiff "'must produce enough evidence of a retaliatory motive such that a reasonable juror could conclude that the [adverse employment action] would not have occurred but for [her] engagement in protected activity.'" *Dye*, 702 F.3d at 305 (quoting *Eckerman*, 636 F.3d at 209). "'A causal link can be shown through direct or circumstantial evidence, including showing temporal proximity between engaging in protected activity and suffering an adverse employment action that may create an inference of causation.'" *Id.* (quoting *Eckerman*, 636 F.3d at 209). Additionally, "incidents of misconduct that do not rise to the level of an adverse employment action 'may be relevant at trial to show a pattern of mistreatment on the job based on plaintiff's protected activities.'" *Id.* (quoting *Eckerman*, 636 F.3d at 208–09).

i.      **Imposition of the WIP**

Regarding the imposition of the WIP, the Court undertakes two separate inquiries: whether a causal connection exists between (i) Barry's ODC grievance and the WIP and **(ii)** Barry's May 7 conversation and the WIP.

The evidence does not establish a causal connection between Barry's ODC grievance and the imposition of the WIP. Barry received the WIP associated with her April 18, 2013 Employee

48

Performance Evaluation on July 2, 2013. (Armitage Dep. at PageID 830–31, 865 [ECF No. 76-1].) The next day—July 3, 2013—Barry filed her grievance with the ODC against Judge O'Grady. (Barry Dep. Part 1 at PageID 61–62; ODC Compl. at PageID 595 [ECF No. 75-7].) Given that Barry suffered an adverse action *before* she engaged in protected speech, no reasonable jury could find that Barry would not have received the WIP but for her filing the ODC grievance. Barry implies that a causal connection could still exist because Defendants "knew, [prior to her receiving the WIP, that she] would be filing a grievance against O'Grady." (Resp. to Mot. for Summ. J. at 69 [ECF No. 108].) The evidence does not support this interpretation. Rather than showing that Defendants knew Barry would be filing a grievance against Judge O'Grady, the evidence indicates that Defendants expected Judge Green to report Barry's allegations to the ODC. Only after Barry's conversation with Judge Green about the status of the grievance (which occurred after Barry had received the WIP) did any of the Defendants reasonably suspect that Barry would be filing a grievance with the ODC. (*See* Green Dep. at PageID 1276–77 [ECF No. 78-1]; May 10, 2013 Shaw Ltr. to Barry at PageID 2607 [ECF No. 91-3].)

The evidence, by contrast, establishes a causal connection, as to Judge O'Grady, between Barry's May 7 conversation with Shaw and the imposition of the WIP. Barry has produced evidence indicating that Judge O'Grady knew the April 18 performance evaluation could result in the issuance of a WIP. (*See* Armitage Dep. at PageID 809, 823–26 [ECF No. 76-1].) And based on the timing of events surrounding the employee evaluation and WIP, a reasonable jury could infer that Judge O'Grady had a role in the issuance of the WIP: Barry received, on April 18, the employee evaluation that allegedly precipitated the issuance of the WIP, but she did not receive her WIP until July 2—after she had spoken with Shaw on May 7 about Judge O'Grady

and after Judge O'Grady learned of Barry's conversation with Shaw. (*See* O'Grady Dep. at PageID 1420–22 [ECF No. 79-1].). Lending further support to this causal connection is the brief span in which all of this occurred. Less than two months passed between Barry's May 7 conversation with Shaw and the issuance of the WIP on July 2. *See Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (indicating that a three-month period between a plaintiff requesting FMLA leave and the plaintiff's termination is evidence of a causal connection).

Although Barry has produced evidence of a causal connection between the May 7 conversation with Shaw and the issuance of the WIP as to Judge O'Grady, Barry cannot establish a causal connection with respect to the other Defendants. Barry has presented no evidence that either Roth or Judge Green was involved in issuing the WIP. Shaw knew that Barry was going to be placed on a WIP. (Shaw Dep. at PageID 1892 [ECF No. 81-1].) But despite her knowledge, there is no evidence that Shaw was involved in preparing or issuing the WIP. And although Barry received the WIP from Judge Glaeden, Barry has presented insufficient evidence of a retaliatory motive on Judge Glaeden's part such that a reasonable jury could conclude that Judge Glaeden issued the WIP because of Barry's May 7 conversation with Shaw. Barry had not accused Judge Glaeden of any involvement in Judge O'Grady's alleged sexual harassment. Nor had Barry accused Judge Glaeden of any other inappropriate behavior. Shaw, Roth, and Judges Glaeden and Green are, thus, entitled to summary judgment on Barry's retaliation claims to the extent that the claims rely on the imposition of the WIP as an adverse action.

### ii.     Transfer to the SRO Position

A reasonable jury could find, with respect to Judge O'Grady, the existence of a causal connection between Barry's protected speech and her transfer to the SRO position. The connection is supported by several pieces of evidence.

To start, Judge O'Grady's retaliatory motive against Barry is clear: Barry spoke about his alleged offensive behavior to the female attorney, to Shaw, and to the ODC.

There also is a temporal proximity between the protected speech and Barry's transfer. Barry was transferred to the SRO position on September 30, 2013, roughly three months after she submitted her grievance to the ODC (on July 3) and roughly five months after the May 7 telephone conversation. Judge O'Grady was aware of Barry's protected speech. (*See, e.g.*, O'Grady Dep. at PageID 1420–22 [ECF No. 79-1]; Shaw Dep. at PageID 1806 [ECF No. 81-1].) A reasonable jury could infer from this temporal proximity that Barry was transferred to the SRO position in retaliation for the protected speech that she engaged in just several months earlier. *See Bryson*, 498 F.3d at 571.

Additional circumstantial support for the causal connection is the fact that the FCMC administration did not conduct an investigation into Barry's allegations of sexual harassment and retaliation. (*See* Armitage Dep. at PageID 866–67 [ECF No. 76-1]; Shaw Dep. at PageID 1771–72, 1778–80, 1805–06, 1809–18 [ECF No. 81-1].) A reasonable jury could infer from this decision that Judge O'Grady did not want Barry's allegations investigated and, thus, retaliated against Barry for attempting to bring attention to her concerns. Defendants insist that they did not conduct an independent investigation into Barry's sexual harassment claims because, from their reading of the applicable rules, the ODC is solely responsible for enforcing the Ohio Code of Judicial Conduct. (*See* Mot. for Summ. J. at 43–44 [ECF No. 75].) But even though the FCMC likely had no jurisdiction to discipline Judge O'Grady, *see* Supreme Court Rules for the Government of the Bar of Ohio, Rule V, Sec. 2(A), the FCMC could have investigated Barry's allegations simply to clarify the underlying facts. Moreover, even if the FCMC had no jurisdiction to even investigate Barry's allegations against Judge O'Grady, Defendants point to

no evidence or law suggesting that the court could not have investigated Barry's allegations against Frank and Saunders. Indeed, the evidence indicates that the FCMC was obligated to investigate Barry's allegations against the bailiffs: the FCMC's sexual harassment policy mandates that the court's human resources manager promptly investigate a report of discrimination or harassment made about an employee. (FCMC Employee Handbook at PageID 2610–11.)

The causal connection is further supported by the scrutiny that Shaw and Armitage began applying to Barry following the May 7 conversation. On May 23, 2013, for example, Shaw inquired about "the date and details" of Barry leaving work or spending time at a different floor. (*See* May 23, 2013 Shaw Email to Armitage at PageID 2704 [ECF No. 96-11].) And around that same period, Armitage began preparing a timeline of events relating to Barry's work performance, attendance, and accusations against Judge O'Grady. *See* Armitage Dep. at PageID 774–76, 841–43.) The FCMC administration's scrutiny following Barry's conversation with Shaw suggests that Barry's transfer to the SRO position may have been retaliatory.

Sullivan's testimony that there was a history at the FCMC of troublemaking and complaint-filing judicial secretaries being sent to the probation department, (*see* Sullivan Dep. at PageID 2078, 2084, 2182 [ECF No. 82-1]), also supports the causal connection between Barry's protected speech and her transfer to the SRO position.

Finally, the fact that Judge O'Grady made several appearances in the magistrate chambers and later signed the form approving Barry's transfer to the SRO position—even though the FCMC had, under Shaw's May 10, 2013 letter, committed to "tak[ing] measures to limit all interaction" between Barry and Judge O'Grady—could be viewed by a reasonable jury as evidence of retaliatory intent. (May 10, 2013 Shaw Ltr. to Barry at PageID 2607 [ECF No. 91-

3]; *see* Barry Dep. Part 2 at PageID 3067–68 [ECF No. 102]; Personnel Action Form at PageID 2391 [ECF No. 83-10].)

Barry has, in sum, presented sufficient evidence of Judge O'Grady's retaliatory motive from which a reasonable jury could conclude that she would not have been transferred to the SRO position but for her speaking with Shaw or filing a grievance with the ODC.

Barry has failed, however, to establish this causal connection with respect to the remaining Defendants.

As to Roth, Barry has not produced evidence from which a reasonable jury could conclude that he knew of her protected speech. Nor has Barry produced evidence from which a reasonable jury could conclude that the other Defendants (who knew of the protected speech) directed Roth to retaliate against Barry. Roth met with Shaw prior to Barry's transfer. From that meeting, Roth simply learned that Barry would be starting with "a clean slate" in an SRO position. (*See* Roth Dep. at PageID 1540–41, 1543 [ECF No. 80-1].) Roth did not ask why Barry was being transferred, and Shaw did not volunteer the information. (*See id.* at PageID 1541–43.) According to Barry, Roth understood that "a judge wanted Teresa Barry gone." (*See* Resp. to Mot. for Summ. J. at 80 [ECF No. 108] (quoting Clark Decl. ¶ 13 [ECF No. 99-1]) (internal quotation marks omitted).) This knowledge is not the same, though, as Roth knowing that Barry had engaged in protected speech. Barry, moreover, has not produced evidence demonstrating that Roth had this knowledge (about a judge wanting her gone) before he assisted with Barry's transfer to the SRO position. (*See* Clark Decl. ¶ 13.) Given the dearth of evidence that Roth knew about Barry's protected speech, no reasonable jury could conclude that Roth had a motive to retaliate against Barry.

53

The evidence is also insufficient to create a genuine issue of material fact regarding the actions of Shaw and Judges Glaeden and Green. Specifically, Barry has not produced sufficient evidence of a retaliatory motive with respect to these Defendants. Barry did not, prior to her transfer to the SRO position, accuse these Defendants of any involvement in Judge O'Grady's alleged sexual harassment. Nor did she, prior to the transfer, accuse them of retaliating against her. She had not filed a grievance with the ODC against either Judge Glaeden or Judge Green. And she had not registered any complaints about Shaw either. Although Judge Green acknowledged in his deposition that the bad actions of one judge could reflect poorly on the entire FCMC, (*see* Green Dep. at PageID 1240–41 [ECF No. 78-1]), there is no evidence to suggest that Judge Green also thought that retaliating against Barry would rectify any bad actions possibly committed by Judge O'Grady. The causal connection between Shaw's actions and Barry's transfer to the SRO position is further attenuated by the fact that Shaw, unlike the judges, lacked authority to ultimately approve Barry's transfer to the SRO position. (*See* Green Dep. at PageID 1224–25 [ECF No. 78-1]; Personnel Action Form at PageID 2391 [ECF No. 83-10].)

Roth, Shaw, and Judges Glaeden and Green are, accordingly, entitled to summary judgment on Barry's First Amendment retaliation claims to the extent that the claims against them rely on the transfer to the SRO position as an adverse action.

### iii.  Harassment in the Probation Department

A reasonable jury could not conclude that a causal connection exists between Barry's protected speech and the harassment she purportedly suffered in the probation department. Barry alleges that Sullivan harassed her in the probation department. (*See* Resp. to Mot. for Summ. J. at 44–47 [ECF No. 108].) There is, however, no evidence to suggest that Sullivan knew of Barry's May 7 conversation with Shaw or Barry's July 2 ODC grievance. Barry attempts to tie Shaw and

54

Judges Glaeden, Green, and O'Grady to this alleged harassment by arguing that they directed Sullivan to harass her. (*See id.* at 64.) But Barry has not produced any evidence to suggest that Sullivan was following explicit directions from these Defendants. The only directive present in the evidence is a mandate from Shaw and Armitage that Sullivan treat Barry like a new employee. (*See* Sullivan Dep. at PageID 2080–82 [ECF No. 82-1].) Barry has also failed to produce evidence from which a reasonable jury could conclude that Sullivan was following these Defendants' implicit directions. As the evidence shows, Sullivan knew little about Barry's history at the court aside from the fact that Barry had previously worked for judges; Sullivan was not even given the opportunity to review Barry's personnel file. (*See id.* at PageID 2078–82, 2182.)

As to Roth, Barry argues that he (i) lied to her about the existence of an SRO position in the probation department and (ii) knew about Sullivan's alleged harassment. (*See* Resp. to Mot. for Summ. J. at 78.) This argument misses the mark. Even if Roth lied to her and knew that Sullivan was harassing her, these facts would fail to establish a causal connection between Barry's protected conduct and the harassment Barry allegedly suffered at Sullivan's hands. Barry does not argue that Roth informed Sullivan of the protected speech. In fact, Barry has not presented evidence that Roth even knew about the protected speech.

Barry suggests that Roth may have subtly encouraged Sullivan's harassment. (*See id.* at 80.) As Kevin Clark, the Deputy Chief Probation Officer at the time, asserts in his declaration, Roth informed Sullivan that "a judge wanted Teresa Barry gone." (Clark Decl. ¶ 13 [ECF No. 99-1] (internal quotation marks omitted).) Clark, however, offers no context for Roth's purported statement and, thus, it is unclear why Roth conveyed to Sullivan that a judge wanted Barry gone. (*See id.*) As Barry insinuates, Roth may have been attempting to encourage Sullivan's

harassment. (*See* Resp. to Mot. for Summ. J. at 80.) But on the other hand, Roth may have shared this information with Sullivan for one of many innocent reasons. And again, the statement offers no indication that Roth actually knew about the protected speech. This enigmatic statement—attributed to Roth through a lengthy chain of communication—is insufficient to create a genuine issue of material fact on the causal connection between Barry's protected speech and the alleged harassment in the probation department. Defendants are, accordingly, entitled to summary judgment on Barry's retaliation claims to the extent that the claims rely on the purported harassment in the probation department as an adverse action.

> 2.     **Same Employment Decision Absent the Protected Speech**

As described above, Barry has stated a prima facie case of First Amendment retaliation against Judge O'Grady. Under the Sixth Circuit's burden-shifting approach to evaluating retaliation claims, Defendants now have the opportunity to demonstrate by a preponderance of the evidence that the employment decisions they made would have been the same absent Barry engaging in her protected speech. *See Dye*, 702 F.3d at 294. Defendants did not couch their arguments in this burden-shifting language, but they have, nonetheless, pointed to evidence suggesting that they would have made the same decisions even if Barry had not spoken with Shaw or filed her grievance with the ODC.

Defendants attempt to undermine the causal connection between Barry's protected speech and her transfer to the SRO position: they contend that Barry made a voluntary choice to accept the position. (Reply in Supp. of Mot. for Summ. J. at 30 [ECF No. 112].) This argument is a nonstarter.

To begin, Barry disputes the notion that she had a choice in the transfer. (Barry Dep. Part 1 at PageID 2861 [ECF No. 97-1].) As she explained in her deposition: "I felt I absolutely had no

choice, because Lori [Banfield] was going back to [the 11th Floor], and none of the judges wanted to switch secretaries." (*Id.*)

But even if Barry did have a meaningful choice in the decision, Barry's choice to become an SRO would not undermine the connection between her protected speech and the transfer. As Defendants have admitted, Barry was, "[p]ursuant to [the] FCMC's policy, . . . removed from the work situation she claimed was sexually hostile pending resolution of her complaint by the ODC." (Reply in Supp. of Mot. for Summ. J. at 29.) Because she made allegations of a sexually hostile work environment, Barry became a secretary without a permanent chambers assignment. (*See id.*) The evidence suggests, in other words, that because of her protected speech, Barry was placed by the court in the situation that led to her transfer to the SRO position.

Defendants attempt to downplay their role in Barry's predicament: they note (i) that Barry was not willing to continue working with Judge O'Grady after her May 7 conversation with Shaw, (ii) that Judge Peeples was not willing to relocate chambers so that Barry could continue working for her, (iii) that Barry declined an offer to work as Judge Glaeden's secretary, and (iv) that no other judge had volunteered to switch secretaries. (*See* Reply in Supp. of Mot. for Summ. J. at 10, 30–31.) These assertions, however, do not erase Defendants' role in Barry's predicament. As Barry stated in her deposition, she should have been able to continue working with Judge Peeples because, "in the past, judges and secretaries have been moved." (Barry Dep. Part 1 at PageID 2862.) Moreover, Barry denies that Judge Glaeden offered the secretarial position in her chambers. (Barry Decl. ¶ 14 [ECF No. 104].) Defendants, in sum, have not produced preponderant evidence showing that Barry would have been transferred to the SRO position even if she had not spoken with Shaw and not filed a grievance with the ODC.

To summarize the analysis of Barry's First Amendment retaliation claims: Barry can maintain a retaliation claim against Judge O'Grady for her transfer to the SRO position and for the issuance of the WIP. Defendants are entitled to summary judgment on all of Barry's other retaliation claims.

## C.     Civil Conspiracy Claim

Barry asserts a § 1983 civil conspiracy claim against Shaw and Judges Glaeden, Green, and O'Grady. (*See* 2nd Am. Compl. ¶¶ 54–60 [ECF No. 46].) She contends that these Defendants entered into a meeting of the minds on or around May 7, 2013 to "use their positions to intimidate [Barry] so that she would withdraw or recant her accusations against O'Grady." (*Id.* ¶ 56.) The conspiracy's goal, she alleges, "was to discredit [her] by actions intended to paper her file so that she could be terminated or would resign as a result of the mental and emotional stress of the retaliatory actions." (*Id.*)

A civil conspiracy under § 1983 is an agreement between two or more persons to injure another by unlawful action. *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011). To prevail on a civil conspiracy claim, a plaintiff must show that (1) a single plan existed, (2) the alleged coconspirator shared in the general conspiratorial objective, and (3) an overt act was committed in furtherance of the conspiracy that caused injury to the plaintiff. *Id.* Given that direct evidence of a conspiracy is rarely available, "it is enough to produce circumstantial evidence sufficient to reasonably infer the existence of a conspiracy." *Womack v. Conley*, 595 F. App'x 489, 494 (6th Cir. 2014). Moreover, in a civil conspiracy, each conspirator "'need not have known all of the details of the illegal plan or all of the participants involved.'" *Bazzi*, 658 F.3d at 602 (quoting *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985)).

Defendants contend that Barry lacks evidence to support her civil conspiracy claim. (*See* Mot. for Summ. J. at 36–38 [ECF No. 75].) The Court agrees. According to Barry, the same evidence that supports her retaliation claims against the individual Defendants also supports her claim that Defendants all conspired to remove her from the Court. (Resp. to Mot. for Summ. J. at 62–64 [ECF No. 108].) As explained above, though, Barry's evidence against the individual Defendants (Judge O'Grady excluded) foundered as to their retaliatory motive. Barry has produced evidence suggesting that Judge O'Grady may have wanted to push Barry out of the FCMC. The evidence does not suggest, however, that the other Defendants shared this objective. Consequently, Defendants are entitled to summary judgment on Barry's civil conspiracy claim.

**D.      Qualified Immunity**

Defendants argue that they are entitled to summary judgement under the doctrine of qualified immunity. (*See* Mot. for Summ. J. at 28, 49 [ECF No. 75].) Under that doctrine, "'government officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Bell v. Johnson*, 308 F.3d 594, 601 (6th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Determining whether qualified immunity shields a defendant from liability involves a two-step inquiry. "First, the court must determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred." *Id.* If a violation could be established, the next step is to determine whether the statutory or constitutional right was clearly established. *Id.* The qualified immunity analysis is a question of law. *Id.*

Defendants' qualified immunity argument is intertwined with their arguments on the

merits of Barry's claims. Barry has supposedly failed to establish that "any one of the individual Defendants intentionally violated constitutional rights of which a reasonable person would have known." (*See* Mot. for Summ. J. at 49.) In light of the Court's summary judgment decision, the Court agrees that Shaw, Roth, and Judges Glaeden and Green are entitled to qualified immunity. Defendants' argument fails, though, with respect to Judge O'Grady given the Court's conclusion that a reasonable jury could find him liable for sexual harassment or for First Amendment retaliation. Judge O'Grady is not entitled to qualified immunity on Barry's surviving claims.

### III. OBJECTIONS AND MOTION TO STRIKE

In her Objections and Motion to Strike [ECF No. 113], Barry requests that the Court strike (i) Subsection H of Defendants' Reply in support of their Motion for Summary Judgment and (ii) an affidavit from Lee Saeger attached to Defendants' Reply.

In Subsection H of their Reply, Defendants argue that Barry has no evidentiary support for her assertion that she was constructively discharged on August 19, 2014. (Reply in Supp. of Mot. for Summ. J. at 42 [ECF No. 112].) Given the Court's conclusion that Defendants did not properly move for summary judgment on Barry's constructive discharge claim, the Court denies as moot Barry's request to strike this subsection.

Defendants cite Saeger's affidavit [ECF No. 112-3] in support of their Subsection H argument. (Reply in Supp. of Mot. for Summ. J. at 42.) Defendants also cite Saeger's affidavit, and one of its attachments, in support of their position that Beverly Sullivan, Barry's supervisor in the probation department, had a benign reason for directing employees not to answer Barry's questions: Defendants suggest that Barry was getting confused by the varying answers she received from different coworkers. (*Id.* at 38.) Because the Court did not rely on Saeger's

affidavit (or its attachments) in deciding Defendants' Motion for Summary Judgment, the Court denies as moot this further request to strike.

### IV. MOTION FOR LEAVE TO FILE A THIRD AMENDED COMPLAINT

Barry has moved for leave to file a Third Amended Complaint. (Mot. for Leave at 1 [ECF No. 103].) Her proposed complaint adds a new claim and a new defendant—a Title VII retaliatory discharge claim against "The State of Ohio" (beneath which is written, on the first page of the complaint, "Franklin County Municipal Court"). (*Id.*)

Federal Rule of Civil Procedure 15(a)(2) provides that leave to amend a pleading should be freely given when justice so requires. The Court considers various factors when determining whether to grant a motion to amend. "Undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing part, and futility of amendment are all factors which may affect the decision." *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 458 (6th Cir. 2001) (quoting *Head v. Jellico Hous. Auth.*, 870 F.2d 1117, 1123 (6th Cir. 1989)).

Defendants oppose Barry's Motion for Leave. (Resp. to Mot. for Leave at 1 [ECF No. 105].) Defendants begin by registering their confusion as to which entity Barry is adding as a defendant. (*Id.* at 2.) Defendants assert, though, that regardless of whether she seeks to add the State of Ohio or the FCMC, Barry's new claim is futile. (*Id.*) Defendants insist that Barry cannot sue the State of Ohio in this Court because the Ohio Court of Claims has exclusive jurisdiction over claims brought against the State. (*Id.*) And they argue that the FCMC is not a legal entity capable of being sued under Title VII. (*Id.* at 3.)

Barry clarifies in her Reply that the proposed defendant is the State of Ohio. (Reply in Supp. of Mot. for Leave at 1 [ECF No. 106].) And as to Defendants' assertion that a plaintiff can

only sue the State under Title VII in the Ohio Court of Claims, Defendants are mistaken. Barry can bring a Title VII claim against the State of Ohio in this Court. *See Portis v. State of Ohio*, 141 F.3d 632, 634 (6th Cir. 1998) (citing *Fitzpatrick v. Bitzer*, 427 U.S. 445, 452–56 (1976)) ("A plaintiff can sue a state under Title VII in federal court without the state's consent."); *see also Williams v. City of Columbus, Ohio*, 892 F. Supp. 2d 918, 923 (S.D. Ohio 2012) (explaining as procedural history, in a case involving Title VII claims, that the court had granted the plaintiff's request to substitute as a defendant the State of Ohio for the Franklin County Municipal Court). Defendants cite *Manning v. Ohio State Library Board*, 577 N.E.2d 650 (Ohio 1991), for the proposition that the Ohio Court of Claims has exclusive jurisdiction over claims brought against the State of Ohio. Defendants read *Manning* too expansively. The Ohio Supreme Court did not, in *Manning* attempt to divest federal courts of their jurisdiction over Title VII claims brought against Ohio. Rather, the Ohio Supreme Court determined "the proper state court of original jurisdiction" for Title VII claims brought against the State. *Manning*, 577 N.E.2d at 653. That is, under *Manning*, if a plaintiff brings her Title VII action against Ohio in a state court—rather than a federal district court—then she must bring her action in the Ohio Court of Claims. *See id.* at 655 (rejecting *amicus curiae* arguments that Ohio "courts of common pleas have jurisdiction over all Title VII claims, even those filed against the state").

Defendants also seem to oppose Barry's Motion for Leave on the basis that Barry has not served the State with her proposed Third Amended Complaint. (Resp. to Mot. for Leave at 2 [ECF No. 105].) This argument falls flat. Defendants do not claim that the State lacks knowledge of the suit. (*See id.*) Nor do Defendants explain how they (or the State) are prejudiced by the fact that Barry has not yet served her *proposed* Third Amended Complaint on the State. (*See id.*) The Court has not yet granted Barry leave to even file the complaint.

Lastly, Defendants assert that they would suffer significant prejudice as a result of Barry amending her complaint now, after (a) the close of discovery and (b) the close of briefing on their Motion for Summary Judgment. (*See* Resp. to Mot. for Leave at 4–5.) Defendants, however, do not offer any specific explanation of how they would be unduly prejudiced by Barry amending her complaint to include a Title VII retaliation claim against the State of Ohio. (*See id.*) Defendants, for example, do not argue that they (or the State) would require additional discovery to investigate the new claim. (*See id.*) Nor do they contend that the State's addition to this case will delay the trial in this matter. (*See id.*) Granted, "'there is an increased burden to show justification for failing to move earlier'" when a plaintiff seeks leave to amend her complaint at a late stage in the litigation. *Siegner v. Twp. of Salem*, 654 F. App'x 223, 228 (6th Cir. 2016) (quoting *Wade*, 259 F.3d at 459). But Barry meets this increased burden given that the Equal Employment Opportunity Commission only issued her right-to-sue letter on June 1, 2016. (EEOC Ltr. at 1 [ECF No. 73-1].) Barry moved quickly after receiving the letter, filing her Motion for Leave on July 9, 2016. (Mot. for Leave at 3 [ECF No. 103].) And, to clarify, when Barry filed her Motion for Leave to File a Third Amended Complaint on July 9, Defendants had already filed—on June 10, 2016—their Motion for Summary Judgment. (Mot. for Summ. J. at 50 [ECF No. 75].) Briefing was not closed, though, on the Motion for Summary Judgment. Barry filed her response on July 20, 2016, and Defendants filed a reply on August 26, 2016. (*See* Resp. to Mot. for Summ. J. at 1 [ECF No. 108]; Reply in Supp. of Mot. for Summ. J. at 44 [ECF No. 112].)

The Court concludes that justice is served by permitting Barry to amend her complaint; accordingly, her Motion for Leave to File a Third Amended Complaint is granted.

## V.   CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment [ECF No. 75] is **GRANTED IN PART** and **DENIED IN PART**. The Court grants in part and denies in part—as detailed above—Defendants' request for summary judgment on Barry's claims under the Equal Protection Clause and the First Amendment. And the Court grants Defendants' request for summary judgment on Barry's civil conspiracy claim. Because they are entitled to summary judgment on all of the claims raised against them, Defendants Shaw, Roth, Glaeden, and Green are **DISMISSED** from the case. Barry's Objections and Motion to Strike [ECF No. 113] is **DENIED AS MOOT**, and Barry's Motion for Leave to File a Third Amended Complaint [ECF No. 103] is **GRANTED**.

**IT IS SO ORDERED.**

3 - 31- 2017
DATE

EDMUND A. SARGUS, JR.
**CHIEF UNITED STATES DISTRICT JUDGE**

64